# PERRY EDUCATION ASSOCIATION *v.* PERRY LOCAL EDUCATORS' ASSOCIATION ET AL.

No. 81–896.   Argued October 13, 1982—Decided February 23, 1983

38

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, POWELL, and STEVENS, JJ., joined, *post*, p. 55.

*Robert H. Chanin* argued the cause for appellant. With him on the briefs were *Michael H. Gottesman, Robert M. Weinberg,* and *Richard J. Darko.*

*Richard L. Zweig* argued the cause for appellees. With him on the brief was *Lawrence M. Reuben.**

JUSTICE WHITE delivered the opinion of the Court.

Perry Education Association is the duly elected exclusive bargaining representative for the teachers of the Metropoli-

---

*\*Edwin Vieira, Jr.,* filed a brief for the Public Service Research Council as *amicus curiae* urging affirmance.

*Solicitor General Lee* filed a memorandum for the United States Postal Service as *amicus curiae.*

tan School District of Perry Township, Ind. A collective-bargaining agreement with the Board of Education provided that Perry Education Association, but no other union, would have access to the interschool mail system and teacher mailboxes in the Perry Township schools. The issue in this case is whether the denial of similar access to the Perry Local Educators' Association, a rival teacher group, violates the First and Fourteenth Amendments.

## I

The Metropolitan School District of Perry Township, Ind., operates a public school system of 13 separate schools. Each school building contains a set of mailboxes for the teachers. Interschool delivery by school employees permits messages to be delivered rapidly to teachers in the District.[1] The primary function of this internal mail system is to transmit official messages among the teachers and between the teachers and the school administration. In addition, teachers use the system to send personal messages, and individual school building principals have allowed delivery of messages from various private organizations.[2]

Prior to 1977, both the Perry Education Association (PEA) and the Perry Local Educators' Association (PLEA) represented teachers in the School District and apparently had equal access to the interschool mail system. In 1977, PLEA

---

[1] The United States Postal Service, in a submission as *amicus curiae*, suggests that the interschool delivery of material to teachers at various schools in the District violates the Private Express statutes, 18 U. S. C. §§ 1693–1699 and 39 U. S. C. §§ 601–606, which generally prohibit the carriage of letters over postal routes without payment of postage. We agree with the Postal Service that this question does not directly bear on the issues before the Court in this case. Accordingly, we express no opinion on whether the mail delivery practices involved here comply with the Private Express statutes or other Postal Service regulations.

[2] Local parochial schools, church groups, YMCA's, and Cub Scout units have used the system. The record does not indicate whether any requests for use have been denied, nor does it reveal whether permission must separately be sought for every message that a group wishes delivered to the teachers.

challenged PEA's status as *de facto* bargaining representative for the Perry Township teachers by filing an election petition with the Indiana Education Employment Relations Board (Board). PEA won the election and was certified as the exclusive representative, as provided by Indiana law. Ind. Code § 20–7.5–1–2(l) (1982).

The Board permits a school district to provide access to communication facilities to the union selected for the discharge of the exclusive representative duties of representing the bargaining unit and its individual members without having to provide equal access to rival unions.[3] Following the election, PEA and the School District negotiated a labor contract in which the School Board gave PEA "access to teachers' mailboxes in which to insert material" and the right to use the interschool mail delivery system to the extent that the School District incurred no extra expense by such use. The labor agreement noted that these access rights were being accorded to PEA "acting as the representative of the teachers" and went on to stipulate that these access rights shall not be granted to any other "school employee organization"—a term of art defined by Indiana law to mean "any organization which has school employees as members and one of whose primary purposes is representing school employees

---

[3] See *Perry Local Educators' Assn.* v. *Hohlt*, 652 F. 2d 1286, 1291, and n. 13 (CA7 1981). It is an unfair labor practice under state law for a school employer to "dominate, interfere or assist in the formation or administration of any school employee organization or contribute financial or other support to it." Ind. Code § 20–7.5–1–7(a)(2) (1982). The Indiana Education Employment Relations Board has held that a school employer may exclude a minority union from organizational activities which take place on school property and may deny the rival union "nearly all organizational conveniences." *Pike Independent Professional Educators* v. *Metropolitan School Dist. of Pike Township*, No. U–76–16–5350 (Oct. 22, 1976) (holding that denying rival union use of a school building for meetings was not unfair labor practice, but that denying union use of school bulletin boards was unfair labor practice).

in dealing with their school employer."[4]   The PEA contract with these provisions was renewed in 1980 and is presently in force.

The exclusive-access policy applies only to use of the mailboxes and school mail system.   PLEA is not prevented from using other school facilities to communicate with teachers. PLEA may post notices on school bulletin boards; may hold meetings on school property after school hours; and may, with approval of the building principals, make announcements on the public address system.   Of course, PLEA also may communicate with teachers by word of mouth, telephone, or the United States mail.   Moreover, under Indiana law, the preferential access of the bargaining agent may continue only while its status as exclusive representative is insulated from challenge.   Ind. Code § 20–7.5–1–10(c)(4) (1982). While a representation contest is in progress, unions must be afforded equal access to such communication facilities.

PLEA and two of its members filed this action under 42 U. S. C. § 1983 against PEA and individual members of the Perry Township School Board.   Plaintiffs contended that PEA's preferential access to the internal mail system violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.   They sought injunctive and declaratory relief and damages.   Upon cross-motions for summary judgment, the District Court entered judgment for the defendants.   *Perry Local Educators' Assn.* v. *Hohlt*, IP 79–189–C (SD Ind., Feb. 25, 1980).

The Court of Appeals for the Seventh Circuit reversed. *Perry Local Educators' Assn.* v. *Hohlt*, 652 F. 2d 1286 (1981).   The court held that once the School District "opens its internal mail system to PEA but denies it to PLEA, it violates both the Equal Protection Clause and the First Amendment."   *Id.*, at 1290.   It acknowledged that PEA had "legal duties to the teachers that PLEA does not have" but rea-

_____
[4] Ind. Code § 20–7.5–1–2(k) (1982).

soned that "[w]ithout an independent reason why equal access for other labor groups and individual teachers is undesirable, the special duties of the incumbent do not justify opening the system to the incumbent alone." *Id.*, at 1300.

PEA now seeks review of this judgment by way of appeal. We postponed consideration of our jurisdiction to the hearing of the case on the merits. 454 U. S. 1140 (1982).

## II

We initially address the issue of our appellate jurisdiction over this case. PEA submits that its appeal is proper under 28 U. S. C. § 1254(2), which grants us appellate jurisdiction over cases in the federal courts of appeals in which a state statute has been held repugnant to the Constitution, treaties, or laws of the United States. We disagree. No state statute or other legislative action has been invalidated by the Court of Appeals. The Court of Appeals has held only that certain sections of the collective-bargaining agreement entered into by the School District and PEA are constitutionally invalid; the Indiana statute authorizing such agreements is left untouched.

PEA suggests, however, that because a collective-bargaining contract has "continuing force and [is] intended to be observed and applied in the future," it is in essence a legislative act, and, therefore a state statute within the meaning of § 1254(2). *King Manufacturing Co. v. City Council of Augusta*, 277 U. S. 100, 104 (1928). In support of its position, PEA points to our decisions treating local ordinances and school board orders as state statutes for § 1254(2) purposes, *Doran v. Salem Inn, Inc.*, 422 U. S. 922, 927, n. 2 (1975); *Illinois ex rel. McCollum v. Board of Education*, 333 U. S. 203 (1948); *Hamilton v. Regents of Univ. of Cal.*, 293 U. S. 245, 257–258 (1934). In these cases, however, legislative action was involved—the unilateral promulgation of a rule with continuing legal effect. Unlike a local ordinance or even a school board rule, a collective-bargaining agreement is not

unilaterally adopted by a lawmaking body; it emerges from negotiation and requires the approval of both parties to the agreement. Not every government action which has the effect of law is legislative action. We have previously emphasized that statutes authorizing appeals are to be strictly construed, *Fornaris* v. *Ridge Tool Co.*, 400 U. S. 41, 42, n. 1 (1970), and in light of that policy, we do not find that § 1254(2) extends to cover this case.[5] We therefore dismiss the appeal for want of jurisdiction. See, *e. g.*, *Lockwood* v. *Jefferson Area Teachers Assn.*, 459 U. S. 804 (1982) (appeal dismissed for want of jurisdiction and certiorari denied).

Nevertheless, the decision below is subject to our review by writ of certiorari. 28 U. S. C. § 2103; *Palmore* v. *United States*, 411 U. S. 389, 396 (1973). The constitutional issues presented are important and the decision below conflicts with the judgment of other federal and state courts.[6] Therefore,

---

[5] PEA's reliance upon *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977), is misplaced. In *Abood*, appellate jurisdiction under 28 U. S. C. § 1257(2) was proper because the constitutionality of the state statute authorizing the negotiation of agency shop agreements was at issue. See Juris. Statement in *Abood* v. *Detroit Bd. of Ed.*, O. T. 1976, No. 75–1153, p. 5.

[6] Constitutional objections to similar access policies have been rejected by all but one other federal or state court to consider the issue. See *Connecticut State Federation of Teachers* v. *Board of Ed. Members*, 538 F. 2d 471 (CA2 1976); *Memphis American Federation of Teachers Local 2032* v. *Board of Ed.*, 534 F. 2d 699 (CA6 1976); *Teachers Local 3724* v. *North St. Francois County School District*, 103 LRRM 2865 (ED Mo. 1979); *Haukedahl* v. *School District No. 108*, No. 75–C–3641 (ND Ill., May 14, 1976); *Federation of Delaware Teachers* v. *De La Warr Board of Ed.*, 335 F. Supp. 385 (Del. 1971); *Local 858, American Federation of Teachers* v. *School District No. 1*, 314 F. Supp. 1069 (Colo. 1970); *Maryvale Educators Assn.* v. *Newman*, 70 App. Div. 2d 758, 416 N. Y. S. 2d 876, appeal denied, 48 N. Y. 2d 605, 424 N. Y. S. 2d 1025 (1979); *Geiger* v. *Duval County School Board*, 357 So. 2d 442 (Fla. App. 1978); *Clark Classroom Teachers Assn.* v. *Clark County School District*, 91 Nev. 143, 532 P. 2d 1032 (1975) *(per curiam)*. The only case holding unconstitutional a school district's refusal to grant a minority union access to teacher's mailboxes or other facilities while granting such privileges to a majority union is *Teachers Local*

regarding PEA's jurisdictional statement as a petition for a writ of certiorari, we grant certiorari.

## III

The primary question presented is whether the First Amendment, applicable to the States by virtue of the Fourteenth Amendment, is violated when a union that has been elected by public school teachers as their exclusive bargaining representative is granted access to certain means of communication, while such access is denied to a rival union. There is no question that constitutional interests are implicated by denying PLEA use of the interschool mail system. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker* v. *Des Moines School District*, 393 U. S. 503, 506 (1969); *Healy* v. *James*, 408 U. S. 169 (1972). The First Amendment's guarantee of free speech applies to teacher's mailboxes as surely as it does elsewhere within the school, *Tinker* v. *Des Moines School District, supra,* and on sidewalks outside, *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972). But this is not to say that the First Amendment requires equivalent access to all parts of a school building in which some form of communicative activity occurs. "[N]owhere [have we] suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for . . . unlimited expressive purposes." *Grayned* v. *City of Rockford*, 408 U. S. 104, 117–118 (1972). The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.

---

*399* v. *Michigan City Area Schools*, No. 72–S–94 (ND Ind., Jan. 24, 1973), vacated on other grounds, 499 F. 2d 115 (CA7 1974).

## A

In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague* v. *CIO*, 307 U. S. 496, 515 (1939). In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Carey* v. *Brown*, 447 U. S. 455, 461 (1980). The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *United States Postal Service* v. *Council of Greenburgh Civic Assns.*, 453 U. S. 114, 132 (1981); *Consolidated Edison Co.* v. *Public Service Comm'n*, 447 U. S. 530, 535–536 (1980); *Grayned* v. *City of Rockford, supra*, at 115; *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940); *Schneider* v. *State*, 308 U. S. 147 (1939).

A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. *Widmar* v. *Vincent*, 454 U. S. 263 (1981) (university meeting facilities); *City of Madison Joint School District* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167 (1976) (school board meeting); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546 (1975) (municipal the-

ater).[7] Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. *Widmar* v. *Vincent, supra,* at 269–270.

Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service* v. *Council of Greenburgh Civic Assns., supra,* at 129. In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. 453 U. S., at 131, n. 7. As we have stated on several occasions, " ' "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." ' " *Id.,* at 129–130, quoting *Greer* v. *Spock,* 424 U. S. 828, 836 (1976), in turn quoting *Adderley* v. *Florida,* 385 U. S. 39, 47 (1966).

The school mail facilities at issue here fall within this third category. The Court of Appeals recognized that Perry School District's interschool mail system is not a traditional public forum: "We do not hold that a school's internal mail system is a public forum in the sense that a school board may not close it to all but official business if it chooses." 652 F. 2d, at 1301. On this point the parties agree.[8] Nor do the parties dispute that, as the District Court observed, the

---

[7] A public forum may be created for a limited purpose such as use by certain groups, *e. g., Widmar* v. *Vincent* (student groups), or for the discussion of certain subjects, *e. g., City of Madison Joint School District* v. *Wisconsin Public Employment Relations Comm'n* (school board business).

[8] See Brief for Appellees 9 and Tr. of Oral Arg. 41.

"normal and intended function [of the school mail facilities] is to facilitate internal communication of school-related matters to the teachers." *Perry Local Educators' Assn.* v. *Hohlt*, IP 79–189–C (SD Ind., Feb. 25, 1980), p. 4. The internal mail system, at least by policy, is not held open to the general public. It is instead PLEA's position that the school mail facilities have become a "limited public forum" from which it may not be excluded because of the periodic use of the system by private non-school-connected groups, and PLEA's own unrestricted access to the system prior to PEA's certification as exclusive representative.

Neither of these arguments is persuasive. The use of the internal school mail by groups not affiliated with the schools is no doubt a relevant consideration. If by policy or by practice the Perry School District has opened its mail system for indiscriminate use by the general public, then PLEA could justifiably argue a public forum has been created. This, however, is not the case. As the case comes before us, there is no indication in the record that the school mailboxes and interschool delivery system are open for use by the general public. Permission to use the system to communicate with teachers must be secured from the individual building principal. There is no court finding or evidence in the record which demonstrates that this permission has been granted as a matter of course to all who seek to distribute material. We can only conclude that the schools do allow some outside organizations such as the YMCA, Cub Scouts, and other civic and church organizations to use the facilities. This type of selective access does not transform government property into a public forum. In *Greer* v. *Spock, supra,* at 838, n. 10, the fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not convert the military base into a public forum. And in *Lehman* v. *City of Shaker Heights*, 418 U. S. 298 (1974) (opinion of BLACKMUN, J.), a plurality of the Court concluded that a city transit system's rental of space in its vehicles for commercial advertising did not require it to accept partisan political advertising.

Moreover, even if we assume that by granting access to the Cub Scouts, YMCA's, and parochial schools, the School District has created a "limited" public forum, the constitutional right of access would in any event extend only to other entities of similar character. While the school mail facilities thus might be a forum generally open for use by the Girl Scouts, the local boys' club, and other organizations that engage in activities of interest and educational relevance to students, they would not as a consequence be open to an organization such as PLEA, which is concerned with the terms and conditions of teacher employment.

PLEA also points to its ability to use the school mailboxes and delivery system on an equal footing with PEA prior to the collective-bargaining agreement signed in 1978. Its argument appears to be that the access policy in effect at that time converted the school mail facilities into a limited public forum generally open for use by employee organizations, and that once this occurred, exclusions of employee organizations thereafter must be judged by the constitutional standard applicable to public forums. The fallacy in the argument is that it is not the forum, but PLEA itself, which has changed. Prior to 1977, there was no exclusive representative for the Perry School District teachers. PEA and PLEA each represented its own members. Therefore the School District's policy of allowing both organizations to use the school mail facilities simply reflected the fact that both unions represented the teachers and had legitimate reasons for use of the system. PLEA's previous access was consistent with the School District's preservation of the facilities for school-related business, and did not constitute creation of a public forum in any broader sense.

Because the school mail system is not a public forum, the School District had no "constitutional obligation *per se* to let any organization use the school mail boxes." *Connecticut State Federation of Teachers* v. *Board of Ed. Members,* 538 F. 2d 471, 481 (CA2 1976). In the Court of Appeals' view, however, the access policy adopted by the Perry schools fa-

vors a particular viewpoint, that of PEA, on labor relations, and consequently must be strictly scrutinized regardless of whether a public forum is involved. There is, however, no indication that the School Board intended to discourage one viewpoint and advance another. We believe it is more accurate to characterize the access policy as based on the *status* of the respective unions rather than their views. Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.[9]

---

[9] JUSTICE BRENNAN minimizes the importance of public forum analysis and all but rejects *Greer* v. *Spock*, 424 U. S. 828 (1976); *Lehman* v. *City of Shaker Heights*, 418 U. S. 298 (1974); and *Jones* v. *North Carolina Prisoners' Union*, 433 U. S. 119 (1977), in each of which, of course, he was in dissent. It will not do, however, to put aside the Court's decisions holding that not all public property is a public forum, or to dismiss *Greer, Lehman,* and *Jones* as decisions of limited scope involving "unusual forums." In *United States Postal Service* v. *Council of Greenburgh Civic Assns.*, 453 U. S. 114, 129 (1981), the Court rejected this argument stating that "[i]t is difficult to conceive of any reason why this Court should treat a letterbox differently for First Amendment access purposes than it has in the past treated the military base in *Greer* . . . , the jail or prison in *Adderley* v. *Florida*, 385 U. S. 39 (1966), and *Jones* . . . , or the advertising space made available in city rapid transit cars in *Lehman*." The Court went on to say that the mere fact that an instrumentality is used for the communication of ideas does not make a public forum, and to reaffirm JUSTICE BLACKMUN's observation in *Lehman:* " 'Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities, immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.' " *United States Postal Service* v. *Council of Greenburgh Civic Assns., supra,* at 130, n. 6, quoting 418 U. S., at 304.

JUSTICE BRENNAN also insists that the Perry access policy is a forbidden exercise of viewpoint discrimination. As noted in text, we disagree with

## B

The differential access provided PEA and PLEA is reasonable because it is wholly consistent with the District's legitimate interest in "" "preserv[ing] the property . . . for the use

this conclusion. The access policy applies not only to PLEA but also to all unions other than the recognized bargaining representative, and there is no indication in the record that the policy was motivated by a desire to suppress PLEA's views. Moreover, under JUSTICE BRENNAN's analysis, if PLEA and PEA were given access to the mailboxes, it would be equally imperative that any other citizen's group or community organization with a message for school personnel—the Chamber of Commerce, right-to-work groups, or any other labor union—also be permitted access to the mail system. JUSTICE BRENNAN's attempt to build a public forum with his own hands is untenable; it would invite schools to close their mail systems to all but school personnel. Although his viewpoint-discrimination thesis might indicate otherwise, JUSTICE BRENNAN apparently would not forbid the School District to close the mail system to all outsiders for the purpose of discussing labor matters while permitting such discussion by administrators and teachers. We agree that the mail service could be restricted to those with teaching and operational responsibility in the schools. But, by the same token—and upon the same principle—the system was properly opened to PEA, when it, pursuant to law, was designated the collective-bargaining agent for all teachers in the Perry schools. PEA thereby assumed an official position in the operational structure of the District's schools, and obtained a status that carried with it rights and obligations that no other labor organization could share. Excluding PLEA from the use of the mail service is therefore not viewpoint discrimination barred by the First Amendment.

Accordingly, the cases relied upon by JUSTICE BRENNAN are fully consistent with our approach to and resolution of this case. *Niemotko* v. *Maryland*, 340 U. S. 268 (1951); *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972); *City of Madison Joint School Dist.* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167 (1976); *Carey* v. *Brown*, 447 U. S. 455 (1980); and *Widmar* v. *Vincent*, 454 U. S. 263 (1981), are cases involving restricted access to public forums. *Tinker* v. *Des Moines School District*, 393 U. S. 503 (1969), did not involve the validity of an unequal access policy but instead involved an unequivocal attempt to prevent students from expressing their viewpoint on a political issue. *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978), and *Consolidated Edison Co.* v. *Public Service Comm'n*, 447 U. S. 530 (1980), do not concern access to government property and are, for that reason, inapposite. Indeed, in *Con-*

to which it is lawfully dedicated." ' " *United States Postal Service*, 453 U. S., at 129–130. Use of school mail facilities enables PEA to perform effectively its obligations as exclusive representative of *all* Perry Township teachers.[10] Conversely, PLEA does not have any official responsibility in connection with the School District and need not be entitled to the same rights of access to school mailboxes. We observe that providing exclusive access to recognized bargaining representatives is a permissible labor practice in the public sector.[11] We have previously noted that the "designation

*solidated Edison,* which concerned a utility's right to use its own billing envelopes for speech purposes, the Court expressly distinguished our public forum cases, stating that "the special interests of a government in overseeing the use of its property" were not implicated. *Id.,* at 539–540.

[10] The Court of Appeals refused to consider PEA's access justified as "official business" because the School District did not "endorse" the content of its communications. We do not see the necessity of such a requirement. PEA has official duties as representative of Perry Township teachers. In its role of communicating information to teachers concerning, for example, the collective-bargaining agreement and the outcome of grievance procedures, PEA neither seeks nor requires the endorsement of school administrators. The very concept of the labor-management relationship requires that the representative union be free to express its independent view on matters within the scope of its representational duties. The lack of an employer endorsement does not mean that the communications do not pertain to the "official business" of the organization.

[11] See, *e. g., Broward County School Board,* 6 FPER ¶ 11088 (Fla. Pub. Emp. Rel. Comm'n, 1980); *Union County Board of Education,* 2 NJPER 50 (N. J. Pub. Emp. Rel. Comm'n, 1976). Differentiation in access is also permitted in federal employment, and, indeed, it may be an unfair labor practice under 5 U. S. C. § 7116(a)(3) (1976 ed., Supp. V) to grant access to internal communication facilities to unions other than the exclusive representative. That provision states that it shall be an unfair labor practice for an agency to "sponsor, control or otherwise assist any labor organization" aside from routine services provided other unions of "equivalent status." A number of administrative decisions construing this language as it earlier appeared in Exec. Order No. 11491, 3 CFR 861 § 19(a)(3) (1966–1970 Comp.), have taken this view. See, *e. g.,* Asst. Sec. Labor-Management Reports, Dept. of the Navy, Navy Commissary Store Complex, Oakland, A/SLMR No. 654 (U. S. Dept. of Labor, 1976); Commissary, Fort Meade,

of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones." *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209, 221 (1977). Moreover, exclusion of the rival union may reasonably be considered a means of insuring labor peace within the schools. The policy "serves to prevent the District's schools from becoming a battlefield for inter-union squabbles." [12]

The Court of Appeals accorded little or no weight to PEA's special responsibilities. In its view these responsibilities, while justifying PEA's access, did not justify denying equal access to PLEA. The Court of Appeals would have been

---

Dept. of the Army, A/SLMR No. 793 (U. S. Dept. of Labor 1977); Dept. of the Air Force, Grissom Air Force Base, A/SLMR No. 852 (U. S. Dept. of Labor, 1977); Dept. of Transportation, Federal Aviation Administration, 2 FLRA No. 48 (1979).

Exclusive-access provisions in the private sector have not been directly challenged, and thus have yet to be expressly approved, but the National Labor Relations Board and the courts have invalidated only those restrictions that prohibit individual employees from soliciting and distributing union literature during nonworking hours in nonworking areas. *NLRB* v. *Magnavox Co.*, 415 U. S. 322 (1974); *Republic Aviation Corp.* v. *NLRB*, 324 U. S. 793 (1945); *NLRB* v. *Arrow Molded Plastics, Inc.*, 653 F. 2d 280, 283–284 (CA6 1981); *General Motors Corp.*, 212 N. L. R. B. 133, 134 (1974). The Court of Appeals' view that *NLRB* v. *Magnavox Co.*, *supra*, held that an exclusive-access provision such as this would be impermissible under the National Labor Relations Act, 29 U. S. C. §§ 151–169 (1976 ed. and Supp. V), is a clear misreading of our decision.

[12] *Haukedahl* v. *School District No. 108*, No. 75–C–3641 (ND Ill., May 14, 1976). This factor was discounted by the Court of Appeals because there is no showing in the record of past disturbances stemming from PLEA's past access to the internal mail system or evidence that future disturbance would be likely. We have not required that such proof be present to justify the denial of access to a nonpublic forum on grounds that the proposed use may disrupt the property's intended function. See, *e. g.*, *Greer* v. *Spock*, 424 U. S. 828 (1976).

correct if a public forum were involved here. But the internal mail system is not a public forum. As we have already stressed, when government property is not dedicated to open communication the government may—without further justification—restrict use to those who participate in the forum's official business.[13]

Finally, the reasonableness of the limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place. These means range from bulletin boards to meeting facilities to the United States mail. During election periods, PLEA is assured of equal access to all modes of communication. There is no showing here that PLEA's ability to communicate with teachers is seriously impinged by the restricted access to the internal mail system. The variety and type of alternative modes of access present here compare favorably with those in other nonpublic

[13] The Court of Appeals was also mistaken in finding that the exclusive-access policy was not closely tailored to the official responsibilities of PEA. The Court of Appeals thought the policy overinclusive—because the collective-bargaining agreement does not limit PEA's use of the mail system to messages related to its special legal duties. The record, however, does not establish that PEA enjoyed or claimed unlimited access by usage or otherwise; indeed, the collective-bargaining agreement indicates that the right of access was accorded to PEA "acting as the representative of the teachers." In these circumstances, we do not find it necessary to decide the reasonableness of a grant of access for unlimited purposes.

The Court of Appeals also indicated that the access policy was underinclusive because the School District permits outside organizations with no special duties to teachers to use the system. As we have already noted in text, see *supra*, at 47–48, there was no District policy of open access for private groups and, in any event, the provision of access to these private groups does not undermine the reasons for not allowing similar access by a rival labor union. See *Greer* v. *Spock, supra*, at 838, n. 10 ("The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix . . . surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever").

forum cases where we have upheld restrictions on access. See, *e. g.*, *Greer* v. *Spock*, 424 U. S., at 839 (servicemen free to attend political rallies off base); *Pell* v. *Procunier*, 417 U. S. 817, 827–828 (1974) (prison inmates may communicate with media by mail and through visitors).

## IV

The Court of Appeals also held that the differential access provided the rival unions constituted impermissible content discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. We have rejected this contention when cast as a First Amendment argument, and it fares no better in equal protection garb. As we have explained above, PLEA did not have a First Amendment or other right of access to the interschool mail system. The grant of such access to PEA, therefore, does not burden a fundamental right of PLEA. Thus, the decision to grant such privileges to PEA need not be tested by the strict scrutiny applied when government action impinges upon a fundamental right protected by the Constitution. See *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 17 (1973). The School District's policy need only rationally further a legitimate state purpose. That purpose is clearly found in the special responsibilities of an exclusive bargaining representative. See *supra*, at 51–52.

The Seventh Circuit and PLEA rely on *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972), and *Carey* v. *Brown*, 447 U. S. 455 (1980). In *Mosley* and *Carey*, we struck down prohibitions on peaceful picketing in a public forum. In *Mosley*, the city of Chicago permitted peaceful picketing on the subject of a school's labor-management dispute, but prohibited other picketing in the immediate vicinity of the school. In *Carey*, the challenged state statute barred all picketing of residences and dwellings except the peaceful picketing of a place of employment involved in a labor dispute. In both cases, we found the distinction between classes of speech violative of the Equal Protection Clause.

The key to those decisions, however, was the presence of a public forum.[14] In a public forum, by definition, all parties have a constitutional right of access and the State must demonstrate compelling reasons for restricting access to a single class of speakers, a single viewpoint, or a single subject.

When speakers and subjects are similarly situated, the State may not pick and choose. Conversely on government property that has not been made a public forum, not all speech is equally situated, and the State may draw distinctions which relate to the special purpose for which the property is used. As we have explained above, for a school mail facility, the difference in status between the exclusive bargaining representative and its rival is such a distinction.

## V

The Court of Appeals invalidated the limited privileges PEA negotiated as the bargaining voice of the Perry Township teachers by misapplying our cases that have dealt with the rights of free expression on streets, parks, and other fora generally open for assembly and debate. Virtually every other court to consider this type of exclusive-access policy has upheld it as constitutional, see n. 6, *supra*, and today, so do we. The judgment of the Court of Appeals is

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE POWELL, and JUSTICE STEVENS join, dissenting.

The Court today holds that an incumbent teachers' union may negotiate a collective-bargaining agreement with a school board that grants the incumbent access to teachers'

---

[14] The Court emphasized the point in both cases. *Mosley*, 408 U. S., at 96 ("Selective exclusions from a public forum may not be based on content alone"); *Carey*, 447 U. S., at 461 ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests").

mailboxes and to the interschool mail system and denies such access to a rival union. Because the exclusive-access provision in the collective-bargaining agreement amounts to viewpoint discrimination that infringes the respondents' First Amendment rights and fails to advance any substantial state interest, I dissent.[1]

I

The Court properly acknowledges that teachers have protected First Amendment rights within the school context. See *Tinker* v. *Des Moines School District*, 393 U. S. 503, 506 (1969). In particular, we have held that teachers may not be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work." *Pickering* v. *Board of Education*, 391 U. S. 563, 568 (1968). See also *Mt. Healthy City Board of Education* v. *Doyle*, 429 U. S. 274, 284 (1977). We also have recognized in the school context the First Amendment right of "individuals to associate to further their personal beliefs," *Healy* v. *James*, 408 U. S. 169, 181 (1972), and have acknowledged the First Amendment rights of dissident teachers in matters involving labor relations. *City of Madison Joint School District* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167, 176, n. 10 (1976). Against this background it is clear that the exclusive-access policy in this case implicated the respondents' First Amendment rights by restricting their freedom of expression on issues important to the operation of the school system. As the Court of Appeals suggested, this speech is "if not at the very apex of any hierarchy of protected speech, at least not far below it." *Perry Local Educators' Assn.* v. *Hohlt*, 652 F. 2d 1286, 1299 (CA7 1981).

From this point of departure the Court veers sharply off course. Based on a finding that the interschool mail system

---

[1] I agree with the Court's conclusion that the appeal should be dismissed for want of appellate jurisdiction. See *ante*, at 43.

is not a "public forum," *ante*, at 48–49, the Court states that the respondents have no right of access to the system, *ibid.*, and that the School Board is free "to make distinctions in access on the basis of subject matter and speaker identity," *ante*, at 49, if the distinctions are "reasonable in light of the purpose which the forum at issue serves." *Ibid.* (footnote omitted). According to the Court, the petitioner's status as the exclusive bargaining representative provides a reasonable basis for the exclusive-access policy.

The Court fundamentally misperceives the essence of the respondents' claims and misunderstands the thrust of the Court of Appeals' well-reasoned opinion. This case does not involve an "absolute access" claim. It involves an "equal access" claim. As such it does not turn on whether the internal school mail system is a "public forum." In focusing on the public forum issue, the Court disregards the First Amendment's central proscription against censorship, in the form of viewpoint discrimination, in any forum, public or nonpublic.

A

The First Amendment's prohibition against government discrimination among viewpoints on particular issues falling within the realm of protected speech has been noted extensively in the opinions of this Court. In *Niemotko* v. *Maryland*, 340 U. S. 268 (1951), two Jehovah's Witnesses were denied access to a public park to give Bible talks. Members of other religious organizations had been granted access to the park for purposes related to religion. The Court found that the denial of access was based on public officials' disagreement with the Jehovah's Witnesses' views, *id.*, at 272, and held it invalid. During the course of its opinion, the Court stated: "The right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body." *Ibid.* In an opinion concurring in the result, Justice

Frankfurter stated that "[t]o allow expression of religious views by some and deny the same privilege to others merely because they or their views are unpopular, even deeply so, is a denial of equal protection of the law forbidden by the Fourteenth Amendment." *Id.*, at 284. See also *Fowler* v. *Rhode Island*, 345 U. S. 67, 69 (1953).

In *Tinker* v. *Des Moines School District, supra,* we held unconstitutional a decision by school officials to suspend students for wearing black armbands in protest of the war in Vietnam. The record disclosed that school officials had permitted students to wear other symbols relating to politically significant issues. *Id.*, at 510. The black armbands, however, as symbols of opposition to the Vietnam War, had been singled out for prohibition. We stated: "Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id.*, at 511.

*City of Madison Joint School District* v. *Wisconsin Employment Relations Comm'n, supra,* considered the question of whether a State may constitutionally require a board of education to prohibit teachers other than union representatives from speaking at public meetings about matters relating to pending collective-bargaining negotiations. The board had been found guilty of a prohibited labor practice for permitting a teacher to speak who opposed one of the proposals advanced by the union in contract negotiations. The board was ordered to cease and desist from permitting employees, other than union representatives, to appear and to speak at board meetings on matters subject to collective bargaining. We held this order invalid. During the course of our opinion we stated: "Whatever its duties as an employer, when the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of their employment, or the content of their speech. See *Police Dept. of*

*Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972)." 429 U. S., at 176 (footnote omitted).[2]

There is another line of cases, closely related to those implicating the prohibition against viewpoint discrimination, that have addressed the First Amendment principle of subject-matter, or content neutrality. Generally, the concept of content neutrality prohibits the government from choosing the subjects that are appropriate for public discussion. The content-neutrality cases frequently refer to the prohibition against viewpoint discrimination and both concepts have their roots in the First Amendment's bar against censorship. But unlike the viewpoint-discrimination concept, which is used to strike down government restrictions on speech by particular speakers, the content-neutrality principle is invoked when the government has imposed restrictions on speech related to an entire subject area. The content-neutrality principle can be seen as an outgrowth of the core First Amendment prohibition against viewpoint discrimination. See generally Stone, Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions, 46 U. Chi. L. Rev. 81 (1978).

---

[2] See also *Widmar* v. *Vincent,* 454 U. S. 263, 280 (1981) (STEVENS, J., concurring in judgment) ("[T]he university . . . may not allow its agreement or disagreement with the viewpoint of a particular speaker to determine whether access to a forum will be granted. If a state university is to deny recognition to a student organization—or is to give it a lesser right to use school facilities than other student groups—it must have a valid reason for doing so"); *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 784–786 (1978) ("In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue. . . . Especially where, as here, the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended" (citation omitted) (footnote omitted)); *Healy* v. *James,* 408 U. S. 169, 187–188 (1972) (the State "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent").

We have invoked the prohibition against content discrimination to invalidate government restrictions on access to public forums. See, *e. g., Carey* v. *Brown,* 447 U. S. 455 (1980); *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972); *Police Department of Chicago* v. *Mosley,* 408 U. S. 92 (1972). We also have relied on this prohibition to strike down restrictions on access to a limited public forum. See, *e. g., Widmar* v. *Vincent,* 454 U. S. 263 (1981). Finally, we have applied the doctrine of content neutrality to government regulation of protected speech in cases in which no restriction of access to public property was involved. See, *e. g., Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530 (1980); *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205 (1975). See also *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 513, 515, 516 (1981) (plurality opinion).

Admittedly, this Court has not always required content neutrality in restrictions on access to government property. We upheld content-based exclusions in *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974), in *Greer* v. *Spock,* 424 U. S. 828 (1976), and in *Jones* v. *North Carolina Prisoners' Union,* 433 U. S. 119 (1977). All three cases involved an unusual forum, which was found to be nonpublic, and the speech was determined for a variety of reasons to be incompatible with the forum. These cases provide some support for the notion that the government is permitted to exclude certain subjects from discussion in nonpublic forums.[3] They pro-

---

[3] There are several factors suggesting that these decisions are narrow and of limited importance. First, the forums involved were unusual. A military base was involved in *Greer* v. *Spock,* advertising space on a city transit system in *Lehman* v. *City of Shaker Heights,* and a prison in *Jones* v. *North Carolina Prisoners' Union.* Moreover, the speech involved was arguably incompatible with each forum, especially in *Greer,* which involved speeches and demonstrations of a partisan political nature on a military base, and in *Jones,* which involved labor union organizational activities in a prison. Finally, we have noted the limited scope of *Greer* and *Lehman* in subsequent opinions. See, *e. g., Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530, 539–540 (1980); *Metromedia, Inc.* v.

vide no support, however, for the notion that government, once it has opened up government property for discussion of specific subjects, may discriminate among viewpoints on those topics. Although *Greer, Lehman,* and *Jones* permitted content-based restrictions, none of the cases involved viewpoint discrimination. All of the restrictions were viewpoint-neutral. We expressly noted in *Greer* that the exclusion was "objectively and evenhandedly applied." 424 U. S., at 839.[4]

Once the government permits discussion of certain subject matter, it may not impose restrictions that discriminate among viewpoints on those subjects whether a nonpublic forum is involved or not.[5] This prohibition is implicit in the *Mosley* line of cases, in *Tinker* v. *Des Moines School District,* 393 U. S. 503 (1969), and in those cases in which we have approved content-based restrictions on access to government property that is not a public forum. We have never held that government may allow discussion of a sub-

---

*San Diego,* 453 U. S. 490, 514, n. 19 (1981) (plurality opinion); *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 209 (1975).

[4] In his concurring opinion in *Greer* v. *Spock,* JUSTICE POWELL noted the absence of any viewpoint discrimination in the regulations and stated that the military authorities would be barred from discriminating among viewpoints on political issues. 424 U. S., at 848, n. 3.

In other cases in which we have upheld restrictions on access to government property, the restrictions have been both content- and viewpoint-neutral. See, *e. g., United States Postal Service* v. *Council of Greenburgh Civic Assns.,* 453 U. S. 114 (1981); *Adderley* v. *Florida,* 385 U. S. 39 (1966).

[5] This is not to suggest that a government may not close a nonpublic forum altogether or limit access to the forum to those involved in the "official business" of the agency. Restrictions of this type are consistent with the government's right " 'to preserve the property under its control for the use to which it is lawfully dedicated.' " *Ante,* at 46 (quoting *United States Postal Service* v. *Council of Greenburgh Civic Assns., supra,* at 129–130). Limiting access to a nonpublic government forum to those involved in the "official business" of the agency also protects the interest of the government, *qua* government, in speaking clearly and definitively.

ject and then discriminate among viewpoints on that particular topic, even if the government for certain reasons may entirely exclude discussion of the subject from the forum. In this context, the greater power does not include the lesser because for First Amendment purposes exercise of the lesser power is more threatening to core values. Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of "free speech."

## B

Against this background, it is clear that the Court's approach to this case is flawed. By focusing on whether the interschool mail system is a public forum, the Court disregards the independent First Amendment protection afforded by the prohibition against viewpoint discrimination.[6] This

---

[6] Lower courts have recognized that the prohibition against viewpoint discrimination affords speakers protection independent of the public forum doctrine. See, e. g., *National Black United Fund, Inc.* v. *Devine,* 215 U. S. App. D. C. 130, 136, 667 F. 2d 173, 179 (1981); *Jaffe* v. *Alexis,* 659 F. 2d 1018, 1020–1021, n. 2 (CA9 1981); *Bonner-Lyons* v. *School Committee of City of Boston,* 480 F. 2d 442, 444 (CA1 1973). In *Jaffe,* the Ninth Circuit stated: "When the content of the speaker's message forms the basis for its selective regulation, public forum analysis is no longer crucial; the government must still justify the restriction and the justification 'must be scrutinized more carefully to ensure that communication has not been prohibited "merely because public officials disapprove of the speaker's views." ' " 659 F. 2d, at 1020–1021, n. 2 (citations omitted). See also *United States Postal Service* v. *Council of Greenburgh Civic Assns., supra,* at 136, 140 (BRENNAN, J., concurring in judgment).

In *Greer* v. *Spock, supra,* I suggested that an undue focus on public forum issues can blind the Court to proper regard for First Amendment interests. After noting that "the notion of 'public forum' has never been the touchstone of public expression," *id.,* at 859 (dissenting opinion), I stated:

"Those cases permitting public expression without characterizing the locale involved as a public forum, together with those cases recognizing the existence of a public forum, albeit qualifiedly, evidence the desirability of a flexible approach to determining whether public expression should be pro-

case does not involve a claim of an absolute right of access to the forum to discuss any subject whatever. If it did, public forum analysis might be relevant. This case involves a claim of equal access to discuss a subject that the Board has approved for discussion in the forum. In essence, the respondents are not asserting a right of access at all; they are asserting a right to be free from discrimination. The critical inquiry, therefore, is whether the Board's grant of exclusive access to the petitioner amounts to prohibited viewpoint discrimination.

## II

The Court addresses only briefly the respondents' claim that the exclusive-access provision amounts to viewpoint discrimination. In rejecting this claim, the Court starts from the premise that the school mail system is not a public forum [7] and that, as a result, the Board has no obligation to

tected. Realizing that the permissibility of a certain form of public expression at a given locale may differ depending on whether it is asked if the locale is a public forum or if the form of expression is compatible with the activities occurring at the locale, it becomes apparent that there is need for a flexible approach. Otherwise, with the rigid characterization of a given locale as not a public forum, there is the danger that certain forms of public speech at the locale may be suppressed, even though they are basically compatible with the activities otherwise occurring at the locale." *Id.*, at 859–860.

[7] It is arguable that the school mail system could qualify for treatment as a public forum of some description if one focuses on whether " 'the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.' *Grayned* v. *City of Rockford*, [408 U. S.], at 116." *United States Postal Service* v. *Council of Greenburgh Civic Associations*, 453 U. S., at 136 (BRENNAN, J., concurring in judgment). It is difficult to see how granting the respondents access to the mailboxes would be incompatible with the normal activities of the school especially in view of the fact that the petitioner and outside groups enjoy such access. The petitioner's messages, and certainly those of the outside groups, do not appear to be any more compatible with the normal activity of the school than the respondents' messages would be. It is not necessary to reach this issue, however, in view of the existence of impermissible viewpoint discrimination.

grant access to the respondents. The Court then suggests that there is no indication that the Board intended to discourage one viewpoint and to advance another. In the Court's view, the exclusive-access policy is based on the status of the respective parties rather than on their views. The Court then states that "[i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." *Ante*, at 49. According to the Court, "[t]hese distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." *Ibid.*

As noted, whether the school mail system is a public forum or not the Board is prohibited from discriminating among viewpoints on particular subjects. Moreover, whatever the right of public authorities to impose content-based restrictions on access to government property that is a nonpublic forum,[8] once access is granted to one speaker to discuss a certain subject access may not be denied to another speaker based on his viewpoint. Regardless of the nature of the forum, the critical inquiry is whether the Board has engaged in prohibited viewpoint discrimination.

The Court responds to the allegation of viewpoint discrimination by suggesting that there is no indication that the Board intended to discriminate and that the exclusive-access policy is based on the parties' status rather than on their views. In this case, for the reasons discussed below, see *infra*, at 66–71, the intent to discriminate can be inferred from the effect of the policy, which is to deny an effective channel of communication to the respondents, and from other

---

[8] The Court's reference to the government's right to make distinctions in access based on "speaker identity" might be construed as a reference to the government's interest in restricting access to a nonpublic forum to those involved in the "official business" of the particular agency. See n. 5, *supra*. The "speaker identity" distinction in this case, however, cannot be justified on this basis. See n. 10, *infra*.

facts in the case. In addition, the petitioner's status has nothing to do with whether viewpoint discrimination in fact has occurred. If anything, the petitioner's status is relevant to the question of whether the exclusive-access policy can be justified, not to whether the Board has discriminated among viewpoints. See *infra*, at 66–69.

Addressing the question of viewpoint discrimination directly, free of the Court's irrelevant public forum analysis, it is clear that the exclusive-access policy discriminates on the basis of viewpoint. The Court of Appeals found that "[t]he access policy adopted by the Perry schools, in form a speaker restriction, favors a particular viewpoint on labor relations in the Perry schools . . . : the teachers inevitably will receive from [the petitioner] self-laudatory descriptions of its activities on their behalf and will be denied the critical perspective offered by [the respondents]." *Perry Local Educators' Assn.* v. *Hohlt*, 652 F. 2d, at 1296. This assessment of the effect of the policy is eminently reasonable. Moreover, certain other factors strongly suggest that the policy discriminates among viewpoints.

On a practical level, the only reason for the petitioner to seek an exclusive-access policy is to deny its rivals access to an effective channel of communication. No other group is explicitly denied access to the mail system. In fact, as the Court points out, *ante*, at 47–48, many other groups have been granted access to the system. Apparently, access is denied to the respondents because of the likelihood of their expressing points of view different from the petitioner's on a range of subjects. The very argument the petitioner advances in support of the policy, the need to preserve labor peace, also indicates that the access policy is not viewpoint-neutral.

In short, the exclusive-access policy discriminates against the respondents based on their viewpoint. The Board has agreed to amplify the speech of the petitioner, while repressing the speech of the respondents based on the respondents' point of view. This sort of discrimination amounts to censor-

ship and infringes the First Amendment rights of the respondents. In this light, the policy can survive only if the petitioner can justify it.

## III

In assessing the validity of the exclusive-access policy, the Court of Appeals subjected it to rigorous scrutiny. *Perry Local Educators' Assn.* v. *Hohlt, supra,* at 1296. The court pursued this course after a careful review of our cases and a determination that "no case has applied any but the most exacting scrutiny to a content or speaker restriction that substantially tended to favor the advocacy of one point of view on a given issue." 652 F. 2d, at 1296. The Court of Appeals' analysis is persuasive. In light of the fact that viewpoint discrimination implicates core First Amendment values, the exclusive-access policy can be sustained "only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S., at 540. Cf. *Carey* v. *Brown,* 447 U. S., at 461–462 (to be valid, legislation must be "finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized"); *Police Department of Chicago* v. *Mosley,* 408 U. S., at 98–99 (discriminations "must be tailored to serve a substantial governmental interest").

## A

The petitioner attempts to justify the exclusive-access provision based on its status as the exclusive bargaining representative for the teachers and on the State's interest in efficient communication between collective-bargaining representatives and the members of the unit. The petitioner's status and the State's interest in efficient communication are important considerations. They are not sufficient, however, to sustain the exclusive-access policy.

As the Court of Appeals pointed out, the exclusive-access policy is both "overinclusive and underinclusive" as a means

of serving the State's interest in the efficient discharge of the petitioner's legal duties to the teachers. *Perry Local Educators' Assn.* v. *Hohlt,* 652 F. 2d, at 1300. The policy is overinclusive because it does not strictly limit the petitioner's use of the mail system to performance of its special legal duties and underinclusive because the Board permits outside organizations with no special duties to the teachers, or to the students, to use the system. *Ibid.* The Court of Appeals also suggested that even if the Board had attempted to tailor the policy more carefully by denying outside groups access to the system and by expressly limiting the petitioner's use of the system to messages relating to its official duties, "the fit would still be questionable, for it might be difficult—both in practice and in principle—effectively to separate 'necessary' communications from propaganda." *Ibid.* The Court of Appeals was justly concerned with this problem, because the scope of the petitioner's "legal duties" might be difficult, if not impossible, to define with precision. In this regard, we alluded to the potential scope of collective-bargaining responsibilities in *City of Madison Joint School District* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167 (1976), when we stated: "[T]here is virtually no subject concerning the operation of the school system that could not also be characterized as a potential subject of collective bargaining." *Id.,* at 177.[9]

---

[9] The Court rejects the Court of Appeals' finding that the exclusive-access policy was overinclusive on the ground that "the record . . . does not establish that [the petitioner] enjoyed or claimed unlimited access by usage or otherwise; indeed, the collective-bargaining agreement indicates that the right of access was accorded to [the petitioner] 'acting as the representative of the teachers.'" *Ante,* at 53, n. 13. Under these circumstances, the Court suggests that it is unnecessary "to decide the reasonableness of a grant of access for unlimited purposes." *Ibid.* This argument is flawed in three ways. First, the Court of Appeals found that "the collective bargaining agreement [did] not limit [the petitioner's] use of the mail system to messages related to its special legal duties," *Perry Local Educators'*

Putting aside the difficulties with the fit between this policy and the asserted interests, the Court of Appeals properly pointed out that the policy is invalid "because it furthers no discernible state interest." *Perry Local Educators' Assn.* v. *Hohlt*, 652 F. 2d, at 1300. While the Board may have a legitimate interest in granting the petitioner access to the system, it has no legitimate interest in making that access exclusive by denying access to the respondents. As the Court of Appeals stated: "Without an independent reason why equal access for other labor groups and individual teachers is unde-

---

*Assn.* v. *Hohlt*, 652 F. 2d 1286, 1300 (CA7 1981), and there is nothing in the record to indicate that the petitioner did *not* enjoy unlimited access. Second, we noted above the nearly limitless scope of collective-bargaining responsibilities. See *supra*, at 67. With no apparent monitoring of the petitioner's messages by the board, *Perry Local Educators' Assn.* v. *Hohlt*, *supra*, at 1293, n. 29, it is clear that there is no real limit to the petitioner's "special legal duties." Finally, even assuming that the Board had a narrowly tailored policy that expressly limited the petitioner's access to official messages and included school monitoring of the messages, it still would be difficult, as the Court of Appeals pointed out, "to separate 'necessary' communications from propaganda." 652 F. 2d, at 1300.

The Court rejects the Court of Appeals' determination that the policy was underinclusive on the ground that there was no District policy of "open access for private groups and, in any event, the provision of access to these private groups does not undermine the reasons for not allowing similar access by a rival labor union." *Ante*, at 53, n. 13 (citing *Greer* v. *Spock*, 424 U. S., at 838, n. 10). Even though there was no apparent policy of open access, the provision of access to outside groups certainly undermines the petitioner's asserted justification for the policy and establishes that the policy is overinclusive with respect to that justification. Moreover, if *all* unions were denied access to the mail system, there might be some force to the Court's reliance on *Greer* for the notion that granting access to some groups does not undermine the reasons for denying it to others. But in a case where the government grants access to one labor group, and denies it to another, *Greer* is irrelevant because even read broadly *Greer* does not support a right on the part of the government to discriminate among viewpoints on subjects approved for discussion in the forum. See *supra*, at 60–61.

sirable, the special duties of the incumbent do not justify opening the system to the incumbent alone." *Ibid.* In this case, for the reasons discussed below, there is no independent reason for denying access to the respondents.[10]

---

[10] A variant of the "special legal duties" justification for the exclusive-access policy is the "official business" justification. As noted, see n. 5, *supra*, the government has a legitimate interest in limiting access to a nonpublic forum to those involved in the "official business" of the agency. This interest may justify restrictions based on speaker identity, as for example, when a school board denies access to a classroom to persons other than teachers. Such a speaker identity restriction may have a viewpoint discriminatory effect, but it is justified by the government's interest in clear, definitive classroom instruction.

In this case, an "official business" argument is inadequate to justify the exclusive-access policy for many of the same reasons that the "special legal duties" rationale is inadequate. As with its relation to the "special legal duties" argument, the exclusive-access policy is both overinclusive and underinclusive with respect to an "official business" justification. First, as the Court of Appeals pointed out, the School Board neither monitors nor endorses the petitioner's messages. *Perry Local Educators' Assn.* v. *Hohlt, supra,* at 1293, n. 29. In this light, it is difficult to consider the petitioner an agent of the Board. Moreover, in light of the virtually unlimited scope of a union's collective-bargaining duties, it expands the definition of "official business" beyond any clear meaning to suggest that the petitioner's messages are always related to the school system's "official business."

More importantly, however, the only Board policy discernible from this record involves a denial of access to one group: the respondents. The Board has made no explicit effort to restrict access to those involved in the "official business" of the schools. In fact, access has been granted to outside groups such as parochial schools, church groups, YMCA's, and Cub Scout units. See *ante,* at 47–48. It is difficult to discern how these groups are involved in the "official business" of the school. The provision of access to these groups strongly suggests that the denial of access to the respondents was not based on any desire to limit access to the forum to those involved in the "official business" of the schools; instead, it suggests that it was based on hostility to the point of view likely to be expressed by the respondents. The Board simply has agreed to shut out one voice on a subject approved for discussion in the forum. This is impermissible.

B

The petitioner also argues, and the Court agrees, *ante*, at 52, that the exclusive-access policy is justified by the State's interest in preserving labor peace.   As the Court of Appeals found, there is no evidence on this record that granting access to the respondents would result in labor instability.   652 F. 2d, at 1301.[11]   In addition, there is no reason to assume that the respondents' messages would be any more likely to cause labor discord when received by members of the majority union than the petitioner's messages would when received by the respondents.   Moreover, it is noteworthy that both the petitioner and the respondents had access to the mail system for some time prior to the representation election.   See *ante*, at 39.   There is no indication that this policy resulted in disruption of the school environment.[12]

---

[11] The Court suggests that proof of disruption is not necessary "to justify the denial of access to a nonpublic forum on grounds that the proposed use may disrupt the property's intended function," *ante*, at 52, n. 12, and again cites *Greer* v. *Spock, supra*.   In *Tinker* v. *Des Moines School District*, 393 U. S. 503 (1969), which is discussed *supra*, at 58, we noted that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."   393 U. S., at 508. Later, we stated that "where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained."   *Id.*, at 509 (citation omitted).   Finally, we stated that "the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible."   *Id.*, at 511.   It is noteworthy that *Tinker* involved what the Court would be likely to describe as a nonpublic forum.   See also *City of Madison Joint School District* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167, 173–174 (1976); *Healy* v. *James*, 408 U. S., at 190–191.   These cases establish that the State must offer evidence to support an allegation of potential disruption in order to sustain a restriction on protected speech.

[12] It appears, therefore, that the exclusive-access provision was included solely at the demand of the majority union in collective-bargaining negotia-

Although the State's interest in preserving labor peace in the schools in order to prevent disruption is unquestionably substantial, merely articulating the interest is not enough to sustain the exclusive-access policy in this case. There must be some showing that the asserted interest is advanced by the policy. In the absence of such a showing, the exclusive-access policy must fall.[13]

## C

Because the grant to the petitioner of exclusive access to the internal school mail system amounts to viewpoint discrimination that infringes the respondents' First Amendment rights and because the petitioner has failed to show that the policy furthers any substantial state interest, the policy must be invalidated as violative of the First Amendment.

## IV

In order to secure the First Amendment's guarantee of freedom of speech and to prevent distortions of "the marketplace of ideas," see *Abrams* v. *United States,* 250 U. S. 616, 630 (1919) (Holmes, J., dissenting), governments generally are prohibited from discriminating among viewpoints on is-

tions. We note that, in this case, the School Board did not even seek review of the Court of Appeals' holding that the mailboxes and the interschool mail system must be open to both unions.

[13] The Court also cites the availability of alternative channels of communication in support of the "reasonableness" of the exclusive-access policy. *Ante,* at 53. In a detailed discussion, the Court of Appeals properly concluded that the other channels of communication available to the respondents were "not nearly as effective as the internal mail system." *Perry Local Educators' Assn.* v. *Hohlt,* 652 F. 2d, at 1299. See also *id.,* at 1299–1300. In addition, the Court apparently disregards the principle that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State,* 308 U. S. 147, 163 (1939). In this case, the existence of inferior alternative channels of communication does not affect the conclusion that the petitioner has failed to justify the viewpoint-discriminatory exclusive-access policy.

sues within the realm of protected speech.   In this case the Board has infringed the respondents' First Amendment rights by granting exclusive access to an effective channel of communication to the petitioner and denying such access to the respondents.   In view of the petitioner's failure to establish even a substantial state interest that is advanced by the exclusive-access policy, the policy must be held to be constitutionally infirm.   The decision of the Court of Appeals should be affirmed.