YOUTH OPPORTUNITIES UNLIMITED, INC., Tameka Lipscomb, by her next friend Vernon Lipscomb, and Shawn Fultz, by his next friend Annette Fultz, Plaintiffs,

v.

The BOARD OF PUBLIC EDUCATION OF THE SCHOOL DISTRICT OF PITTSBURGH PA., Dr. Richard Wallace, Superintendent, and Carole Annis, Barbara Burns, Joseph Cali, Jean Fink, Richard Flanagan, Edwin Grinberg, William Larkin, Valerie McDonald, Ronald Suber, individually and officially as members of The Board of Public Education, Louise Brennen, Elementary and Middle Schools Supervisor, Defendants.

Civ. A. No. 91–1106.

United States District Court, W.D. Pennsylvania.

July 12, 1991.

William A. Bonner, Media, Pa., Joseph L. Luciana, III, Kirkpatrick & Lockhart, Pittsburgh, Pa., for plaintiffs.

Veleter M.B. Mazyck, Pittsburgh Bd. of Educ., Pittsburgh, Pa., for defendants.

## OPINION

STANDISH, District Judge.

This is a civil rights action under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Plaintiffs seek damages and injunctive and declaratory relief for the alleged denial of their constitutional rights by defendants. Specifically, plaintiffs claim that defendants have denied them their rights to free-

dom of expression, to freedom of association and to the free exercise of religion, by revoking permits that had been issued to plaintiff Youth Opportunities Unlimited, Inc. (Y.O.U.) to conduct a summer program for economically disadvantaged children on public school property. Pursuant to Section 7(b) of the 1979 amendments to the regulations regarding the use of Pittsburgh public school facilities, defendants have revoked the permits issued to Y.O.U. because of the religious content of its program.

Presently, before the court is the motion of plaintiffs for a preliminary injunction to reinstate, and to enjoin defendants from revoking, the two permits issued on May 7, 1991 and June 10, 1991 for use of the Northview Heights Elementary School and the Allegheny Middle School. For the reasons set forth below, plaintiffs' motion will be granted.

*Findings of Fact*

Based on the present record, the court concludes that it is reasonably probable that the following facts will be established at a final hearing:

1. Plaintiff Y.O.U. is a non-profit, tax-exempt corporation organized and existing under the laws of the Commonwealth of Pennsylvania. Y.O.U.'s principal place of business is located at 2020 North Charles Street, Pittsburgh, Pennsylvania.[1]

2. Defendant The Board of Public Education of the School District of Pittsburgh, Pennsylvania (the Board) is a duly organized board of education under the statutes and codes of the Commonwealth of Pennsylvania. Defendants Carole Annis, Barbara Burns, Joseph Cali, Jean Frank, Richard Flanagan, Edwin Grinberg, William Larkin, Valerie McDonald and Ronald Suber are duly elected members of the Board. Defendant Dr. Richard Wallace is the Superintendent of the Pittsburgh School District, and defendant Louise Brennen is the Elementary and Middle Schools Supervisor of the Pittsburgh School District.

---

1. The individual plaintiffs, Tameka Lipscomb and Shawn Fultz, are children who are presently enrolled in Y.O.U.'s summer program.

3. Y.O.U.'s current brochure states in part:

### Mission Statement

The mission of Y.O.U. is to lead and equip every young person with whom we have contact to fully reach their God given potential.

### Presuppositions

Full potential can be reached only through a saving relationship with God through Jesus the Christ. Individual growth towards full potential continues through the discipling process. Roadblocks to reaching full potential must be removed by the amelioration of negative environmental influences. Negative environmental influences include family dysfunction, economic poverty, educational deficiencies, poor social skills, various addictions and detrimental peer relationships.

(Plaintiffs' Exh. 5).

Y.O.U. is publicly known by other churches and by the community at large. The Christian orientation of Y.O.U. has been known to the Board for years.[2]

4. Y.O.U. has a staff of 15 full-time employees and 3 or 4 part-time employees. For the summer program, approximately 100 neighborhood people are hired, including 15 to 20 people who are employed by the Pittsburgh public school system. Four teachers from the Pittsburgh public schools are hired to conduct Y.O.U.'s reading program so that it will be compatible with the public school reading program.

5. Participation in Y.O.U.'s summer program is voluntary, and the children are registered by their parents. Y.O.U.'s current brochure contains the following statement regarding the summer program, "Fun with the Son":

### SUMMER PROGRAM

Imagine the joy of working on a mission field where each morning begins with the sound of children's voices singing; this is the Y.O.U. Summer Program. For six weeks each summer we are permitted to use two of the Pittsburgh Public Schools to operate a program where 600 children, kindergarten through high school, are nourished, trained, supported and loved. Breakfast and lunch are also provided free of charge. This is an opportunity for the children to have fun in a Christian atmosphere where the emphasis is the Gospel of Jesus Christ, sportsmanship, character development and education. The classes are remedial reading, bible, arts and crafts, music, competitive sports, gym and field trips. Adults and young adults who are interested in youth work are hired as teachers and aids. Churches and other organizations sponsor men and women to work as interns in the program. "This is an unforgettable experience" is a quote from one of the 130 summer staff members. Our desire is for it to be an unforgettable experience for our children also.

(Plaintiffs' Exh. 5).

6. The Board issues 3,300 permits each year for the use of public school facilities by outside organizations. On May 23, 1979, the Board passed a resolution amending its regulations for use of school property. For purposes of this litigation, the relevant amendment regarding the use of school facilities states:

*Section 7*—Permits shall not be granted in the following instances:

\* \* \* \* \* \*

(b) To anyone for any religious or sectarian purposes;

\* \* \* \* \* \*

Dr. Wallace, Superintendent of Pittsburgh public schools since September, 1980, testified that there are no rules or guidelines

---

**2.** A former brochure for Y.O.U. lists Dr. Stanley J. Herman, Jr., Associate Superintendent of Pittsburgh Public Schools, and Dr. Kenneth Barbour, principal of Manchester School, a Pittsburgh public school, as members of its Board of Directors. (Plaintiffs' Exh. 4). In the past, Dr. Barbour observed Y.O.U.'s summer program, including the opening prayers and religious hymns. Y.O.U.'s current brochure lists Mrs. Gayle Forsythe, a Pittsburgh public school teacher, as a member of its Board of Directors. (Plaintiffs' Exh. 5).

regarding the implementation of Section 7(b), and that he relies on the executive director of business affairs to implement this Board policy. He stated that the Board has been consistent in implementing its policy. To determine whether a particular purpose will violate Section 7(b), the principal or executive director of business affairs refers to the applicant's description of the purpose of the proposed use of school property. If there is any doubt about a proposed use of such property, the solicitor for the Board, Robert J. Stefanko, Esquire, is consulted.[3]

7. The permits issued by the Board in 1990 and 1991 have included the following:

| Name | Purpose of Use of School Property |
|------|-----------------------------------|
| a. Banu Elnut Islamic Center | Series of workshops on the ideas of Malcolm Shabazz in aiding the poor, oppressed and disadvantaged |
| b. Rodman Street Baptist Church | Food distribution |
| c. The Victory Baptist Church | To involve youth of Victory Baptist Church in joint activities |
| d. Allegheny Middle School | Christmas Holiday Concert for parents and children accompanied by parents |
| e. Christian Service Brigade | swim meet |
| f. Allegheny General Hospital Pediatric Clinic | To provide a free Christmas show for the children ages 4–16 years who attend our clinic using the CLO ministars |
| g. United Jewish Federation | Rehearsal/Campaign Event |
| h. Chorus, Gospel Choir | ——— |
| i. Allegheny County Democratic Committee | to hear candidates speak |
| j. Mt. Zion Baptist Church Outreach | (Basketball, Volleyball) |

(Plaintiffs' Exhs. 2A–2F and 3A–3D).

8. In the last two years, Gwendolyn Bynum, a member of the Community College of Allegheny County Gospel Ensemble, has performed gospel music in the Pittsburgh public schools on several occasions. The

---

3. Section 7(b) is incorporated into the REGULATIONS REGARDING THE USE OF PITTSBURGH PUBLIC SCHOOL FACILITIES on the backside of the application. Paragraph 2 reads as follows:

2. Permits *shall not* be granted in the following instances: (a) permits during normal school hours that are detrimental to the educational process or disruptive to students and personnel; (b) for religious or sectarian purposes; (c) for boxing, wrestling, judo, karate, or other martial arts; (d) for meetings for which admission is charged in which motion pictures or video tapes are shown for commercial purposes; (e) for meetings at which intoxicants will be consumed; (f) for events in which facilities renovations or modifications are required; (g) for events in which an individual or profit-making group intends to earn a profit for personal gain; (h) for events in which the permit applicant intends to transfer or sub-contract the permit to another party. NOTE: This list is not exhaustive but only illustrative of the types of uses for permits will not be granted.

The court notes that subsection (b) is the only regulation that places restrictions on speech.

songs had Christian themes and contained references to God. Moreover, approximately 1½ years ago, an evening concert by a group called "Commission" was held at Peabody High School, a Pittsburgh public school. The religious lyrics to one of the songs that was performed by the group were recited by Ms. Bynum.

9. For the past twenty years, the Board has issued permits to Y.O.U. for the use of various Pittsburgh public school buildings for its summer program.[4] Through the use of these facilities, Y.O.U. has been able to provide a daily summer program for economically disadvantaged children known as "Fun with the Son." The children involved range from elementary school age to high school age. The student bodies of the Northview Heights Elementary School and the Allegheny Middle School are not involved in the program. The program provides vital supervision during the summer months for children, many of whose parents work and cannot afford day care. The program runs for 6 weeks and the enrollment fee for the program is $2.00. Each summer, approximately 600 children participate in the program which offers breakfast and lunch to each participant as well as the activities referred to above in paragraph 5. The summer program has always included daily prayer and some other religious content. There has never been any objection by the Board until this summer.[5]

10. On April 29, 1991, an application was filed by Y.O.U. for the use of various facilities at the Northview Heights Elementary School during the period June 24 through August 2, 1991. The application did not list religious activities as a purpose for the use of school property. The approximate attendance expected at each use was estimated to be 300 children. A permit was issued by the Board on May 7, 1991.

11. On June 6, 1991, Y.O.U. filed an application for the use of various facilities at the Allegheny Middle School during the period June 24 through August 2, 1991. This application also failed to list religious activities as a purpose for the use of school property. The approximate attendance expected at each use was estimated to be 300 children. A permit was issued by the Board on June 10, 1991.

12. Henry L. Stephens, Jr. has been the principal of Allegheny Middle School for the past two years.[6] In this position, he has the initial responsibility for approval of applications from outside organizations for permits to use the school's facilities. He has been instructed to adhere to Board policy, as revised by the 1979 amendments, in reviewing applications for permits, including the policy embodied in Section 7(b) which prohibits permits for religious or sectarian purposes.

13. On June 21, 1991, Mr. Stephens met with Y.O.U.'s executive director, Michael Bowling, and its program director, David Lipke, to discuss the availability of the auditorium, the gym and the public address system at the Allegheny Middle School.

---

4. Dr. Wallace has been aware of Y.O.U.'s summer program, including remedial instruction and recreational activities, since the summer of 1981. However, he claimed to have no direct knowledge of any religious activity during the summer program.

5. Numerous letters of commendation were submitted into evidence by Y.O.U., including letters from the following Pittsburgh public school employees who occupied the listed positions at the time the letters were written: Louis A. Venson, Ph.D., principal of Manchester Elementary School; Louise R. Brennen, Associate Superintendent of the Department of Elementary and Middle Schools; Stanley J. Herman, Associate Superintendent of Curriculum and Program Management; Thelma Greene, teacher at the Columbus Middle School; Jerry C. Olson, Superintendent of Schools; Louis J. Kishkunas, Assistant Superintendent for Occupational, Vocational and Technical Education; Dr. Kenneth Barbour, principal of Manchester Elementary School; and Ann N. Moniot, Executive Associate to the Associate Superintendent.

6. Mr. Stephens has been employed by the Board for 19½ years. During this time, he has been the principal of 3 public schools in the City of Pittsburgh. He has participated in the grant of several permits to religious organizations to use school facilities for athletic activities. However, he has never issued a permit to a religious organization for religious activities, such as proselytizing or worship. This is the first summer since Mr. Stephens has been the principal of Allegheny Middle School that Y.O.U. has used that facility for its summer program.

The subject of the public address system led to a discussion of the content of Y.O.U.'s program. Mr. Stephens was informed that the program included morning prayers, the singing of religious hymns and the reading of scripture materials. Mr. Stephens was concerned about these activities because he believed that they were contrary to the policy of the Board for the enforcement of which he was responsible.[7] In response, Mr. Stephens contacted Louise Brennen, the Elementary and Middle Schools Supervisor. At her request, he reduced to writing what he had learned about the religious content of Y.O.U.'s summer program for review by, and the advice of, the Board's solicitor, Robert J. Stefanko, Esquire, concerning the conformity of the Y.O.U. program to Board policy.

14. Louise Brennen conferred with Attorney Stefanko on the same day and called the offices of Y.O.U. Mr. Bowling was out of the office on business; however, she spoke with Mr. Lipke and informed him that the religious content of Y.O.U.'s summer program was contrary to Board policy. He was asked to eliminate these portions of the summer program until an agreement could be reached.

15. On Monday, June 24, 1991, Y.O.U. began its summer program at both public schools without any religious activity. Thereafter, a meeting was held among counsel for the parties, and school district and Y.O.U. officials. They discussed resolution of the perceived violation of Board policy against school use for religious or sectarian purposes. Y.O.U. was informed that its permit would be revoked if it continued to engage in prayer, the singing of religious hymns and Bible reading. However, the school district officials agreed that, if Y.O.U. insisted on continuing to include religious activities in its summer program, it would be permitted to remain in the public school buildings until the end of the week to enable it to find another location for the program.[8]

16. On July 1, 1991, plaintiffs filed the present action. By order dated July 3, 1991, defendants were temporarily restrained from evicting Y.O.U. from the school buildings until a hearing on plaintiffs' motion for a preliminary injunction could be completed. On July 8, 1991, the order was extended to July 12, 1991.

*Conclusions of Law*

Based on the foregoing findings of fact, the court makes the following conclusions of law:

17. This court has jurisdiction over the parties, and has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). The court also has jurisdiction to declare the rights of the parties, and to grant further necessary or proper relief, under 28 U.S.C. §§ 2201 and 2202.

18. In considering a motion for preliminary injunctive relief, a court must carefully weigh four elements: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of such relief; (3) whether granting the preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest. *See, e.g., ECRI v. McGraw-Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987); *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985); *Gregoire v. Centennial School Dist.,* 674 F.Supp. 172, 175–176 (E.D.Pa.1987), *aff'd without opinion,* 853 F.2d 917 (3d Cir.) and 853 F.2d 918 (3d Cir.1988). In the present case, the court concludes that plaintiffs have established all four elements.

■ 19. It is clear that engaging in religious worship and discussion are forms of speech and association that are protected by the First Amendment. *See Widmar v.*

---

7. Applications for permits are initially directed to the principal of the school which an organization is seeking to use. Although the executive director of business affairs has the final responsibility for issuing permits on behalf of the Board, the school principal's recommendation to grant or deny an application is given great deference because of his or her familiarity with the use of school rooms and their availability.

8. This permission was thereafter extended to Monday, July 1, 1991 after which further permission to use the buildings was denied.

*Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440, 447 (1981). It is also clear that the Board's revocation of Y.O.U.'s permits to use public school facilities for its summer program was based on the content of its speech.

20. In its analysis of restrictions on First Amendment activity on public property, three categories of such property have been defined by the United States Supreme Court. In *Perry Education Assoc. v. Perry Local Educators' Assoc.,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court stated:

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515 [59 S.Ct. 954, 963, 83 L.Ed. 1423] (1939). In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Carey v. Brown,* 447 U.S. 455, 461 [100 S.Ct. 2286, 2290, 65 L.Ed.2d 263] (1980). The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *United States Postal Service v. Council of Greenburgh Civic Assns.,* 453 U.S. 114, 132 [101 S.Ct. 2676, 2686, 69 L.Ed.2d 517] (1981); *Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 535–536 [100 S.Ct. 2326, 2332, 65 L.Ed.2d 319] (1980); *Grayned v. City of Rockford, supra,* [408 U.S. 104,] at 115 [92 S.Ct. 2294, at 2302, 33 L.Ed.2d 222 (1972)];

*Cantwell v. Connecticut,* 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213] (1940); *Schneider v. State,* 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155] (1939).

> A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. *Widmar v. Vincent,* 454 U.S. 263 [102 S.Ct. 269, 70 L.Ed.2d 440] (1981) (university meeting facilities); *City of Madison Joint School District v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167 [97 S.Ct. 421, 50 L.Ed.2d 376] (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546 [95 S.Ct. 1239, 43 L.Ed.2d 448] (1975) (municipal theater). (footnote omitted) Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. *Widmar v. Vincent, supra,* [454 U.S.] at 269–270 [102 S.Ct. at 279].

> Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Assns., supra,* [453 U.S.] at 129 [101 S.Ct. at 2684]. In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. 453 U.S. at 131, n. 7 [101 S.Ct. at 2686, n. 7]. As we have stated on several occasions, " ' "[t]he State, no less than a pri-

vate owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." ' " *Id.* at 129–130 [101 S.Ct. at 2684], quoting *Greer v. Spock*, 424 U.S. 828, 836 [96 S.Ct. 1211, 1216, 47 L.Ed.2d 505] (1976), in turn quoting *Adderley v. Florida*, 385 U.S. 39, 47 [87 S.Ct. 242, 247, 17 L.Ed.2d 149] (1966).

460 U.S. at 45–46, 103 S.Ct. at 954–955, 74 L.Ed.2d at 804–805.

21. In *Gregoire v. Centennial School Dist.*, 907 F.2d 1366 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990), a subsidiary of the Campus Crusade for Christ, Inc., Student Venture, was denied permission by the Centennial School District to rent a high school auditorium for the performance of a well-known illusionist/magician, Andre Kole. Kole is a traveling representative for Campus Crusade who performs and then, after an intermission when anyone may leave, he delivers an account of his investigation of the miracles of Christ and how Jesus Christ changed the course of his life. Student Venture filed suit in the United States District Court for the Eastern District of Pennsylvania, claiming that the denial of the use of the school facility violated its First Amendment freedoms of speech and assembly, the Fourteenth Amendment's equal protection clause, and both the free exercise and establishment clauses of the First Amendment. The district court granted a permanent injunction against denial of access, but precluded the use of school facilities for religious worship or distribution of literature. Both parties appealed. The United States Court of Appeals for the Third Circuit held that the school board had created a designated open public forum; that the use of school facilities by a religious organization would not violate the Establishment Clause of the First Amendment; and that there was no basis for precluding religious worship or distribution of literature.

■ 22. In *Gregoire*, Judge Mansmann discussed the factors to be considered in determining the character of a particular forum as follows:

The Supreme Court in *Perry* and in *Cornelius* validated the use of forum analysis to achieve a balance between the government's interest in limiting the use of the property and the interests of those seeking access. *Cornelius* [*v. NAACP Legal Defense & Ed. Fund*], 473 U.S. [788] at 800, 105 S.Ct. [3439] at 3447 [87 L.Ed.2d 567 (1985)]. In these cases, the Court identified several factors to be considered in determining whether a particular forum should be categorized as open or closed. We first examine these factors in general terms in order to establish a framework for the evaluation of this case.

The first relevant factor is governmental intent. We must evaluate "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.* at 803, 105 S.Ct. at 3449. The nature of the property and its compatibility with expressive activity provide additional information bearing on intent. *Id.* at 802, 105 S.Ct. at 3448 (intent to create a public forum will not be inferred when the nature of the property is inconsistent with expressive activity).

A second factor relevant to categorizing a forum as open or closed is the extent of use granted. We must determine, by examining Centennial's policy and practice, whether use of its facilities is open to "all comers" or whether it has been limited by well-defined standards tied to the nature and function of the forum. *Perry*, 460 U.S. at 46–47, 103 S.Ct. at 955–956.

Consistency in granting or refusing access to the forum is also important to proper classification. Any permission procedure and its application to similarly situated speakers must be considered in evaluating consistency. *See Cornelius*, 473 U.S. at 804–05, 105 S.Ct. at 3450–51 (consistent application of requisite permission procedure and lack of evidence suggesting that granting permission was

merely ministerial were factors in finding closed forum).

907 F.2d at 1371.

Applying these factors to the present case, the court concludes that the Board has created a designated open public forum in its public school facilities.

23. The evidence offered at the hearing established that the Board issues thousands of permits each year to outside organizations to use various school facilities, including classrooms, auditoriums, libraries, public address systems and gyms. It is obvious that the nature of these school facilities, after-hours, is compatible with expressive activity. Moreover, it is apparent that, under the Board's past policy and practice, permits have been issued virtually without limitation to such diverse organizations as religious groups, political groups, charitable groups, civic groups, parent and teacher associations, neighborhood groups, senior citizen groups, school groups and athletic groups.[9] The purposes for which permits have been issued include meetings, sports events, fund raisers, variety and talent shows, testing sites, band and play practices, workshops and classes. (Plaintiffs' Exhs. 1 and 2). In fact, the Board failed to offer any evidence of an instance in which a permit was denied to any organization for any purpose.

24. Defendants argued that they can maintain a non-public forum as to certain specified purposes. In *Gregoire*, the Court of Appeals stated:

> While the Supreme Court in *Perry* and *Cornelius* opined that intent, as evidenced by a government's statements, is a factor to be considered in forum classification, it also made it clear that the forum inquiry does not end with the government's statement of intent. To

allow, as would the dissent, the government's statements of intent to end rather than begin the inquiry into the character of the forum would effectively eviscerate the public forum doctrine; the scope of first amendment rights would be determined by the government rather than by the Constitution. Any forum classification must be rooted in the facts of the particular case; forum classification "should be triggered by what a school does, not what its says." *Board of Education v. Mergens*, —— U.S. [——] at ——, 110 S.Ct. [2356] at 2369 [110 L.Ed.2d 191] (quoting 130 Cong.Rec. 19222 (1984) (statement of Sen. Leahy)). *Cornelius* and *Perry* direct that we look, therefore, not only at what Centennial says in its policy but at how that policy has been applied. Policy *and* practice are relevant in determining the government's intent. *See, Perry*, 460 U.S. at 37, 103 S.Ct. at 948 and *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448.

907 F.2d at 1374.

The proper forum classification in the present case must be based on what the Board does in practice, and not what it says. As set forth in the court's findings, the Board has issued permits many times in the past to Y.O.U., as well as to religious organizations, for a variety of purposes, including workshops on a particular religious leader's ideas, food distribution, youth activities, athletic events and gospel singing. In addition, the Board has issued permits to several organizations for Christmas shows and concerts. Having opened its facilities to certain religious organizations, including Y.O.U. for a variety of religious purposes, the Board cannot deny the use of such facilities to Y.O.U. due to the content of the speech in *its* summer program.

---

9. In addition to Y.O.U., some of the specific groups to which permits have been granted by the Board in the past include The Urban League, The Fraternal Order of Police, The National Slavic High School Honor Society, The Task Force for Bridging the Racial Gap, 7th Masonic District of the Prince Hall Grand Lodge of Pennsylvania, 100 Black Men, Pittsburgh Department of Public Safety, Camp Fire Girls, Brownies, Girl Scouts, Boy Scouts, Cub Scouts, Carnival Committee of the Beltzhoover Elementary School, Bon Air Civic Association, Concerned Parents, the PTA, Children's Hospital, The Rehabilitation Institute, Shuman Detention Center, Allegheny General Hospital Pediatric Clinic, Pittsburgh Paramedics, Homewood Brushton YMCA and the United Way.

25. Based on the determination that the Board has created a designated open public forum, the same standards as apply in a traditional public forum are applicable to the Board's decisions to grant or deny permits. Specifically, the actions of the Board in granting or denying permits are subject to a strict scrutiny test. The Board may enforce time, place and manner regulations on expression in its school facilities so long as those regulations are content-neutral and narrowly tailored to serve a compelling state interest. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955, 74 L.Ed.2d at 805. In the present case, the Board's actions do not pass the strict scrutiny test.

26. With respect to whether the Board's regulations are content-neutral, it is undisputed that the Board is seeking to revoke the permits issued to Y.O.U. based on the religious content of its summer program. This fact is established by the Board's offer not to revoke Y.O.U.'s permits if it eliminates the opening prayers, religious hymns and Bible readings from the summer program. Although the Board denies that it allows some religious speech to the exclusion of other, the evidence does not support this assertion. Based on the testimony and exhibits offered by Y.O.U., it is clear that public school facilities have been utilized for performances of gospel music by a number of different groups, and that Christmas shows and concerts have been held in public school auditoriums by several outside organizations. Moreover, until 1991, Y.O.U.'s summer program has been sanctioned every year since the Board's current policy was adopted in 1979. These facts compel the conclusion that the application of the Board's policy to Y.O.U.'s summer program is not content-neutral.

27. Turning to the compelling state interest that would be served by allowing the Board to revoke Y.O.U.'s permits, the Board has never articulated that interest. Presumably, the Board is seeking to avoid a violation of the Establishment Clause by

its actions; however, defendants offered no evidence on this issue. Paradoxically, defendants' withdrawal of Y.O.U.'s permits because of the religious content of its summer program may have the opposite effect. Addressing Establishment Clause concerns, the Court of Appeals in *Gregoire* stated:

> Establishment clause questions are governed by the three-prong test of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). To pass constitutional muster, the governmental policy "must have a secular legislative purpose; second, its principal or primary effect must by one that neither advances nor inhibits religion ...; finally, the policy must not foster excessive government entanglement with religion." *Id.* at 612–613, 91 S.Ct. at 2111–12. The *Lemon* test may be applied more or less strictly depending upon the educational setting in which the speech arises ...

907 F.2d at 1380.[10]

As in *Gregoire,* it is undisputed that, in establishing its permit regulations, and in granting permits to a wide variety of outside organizations for a multitude of purposes, the Board has no religious objective or nonsecular purpose. Accordingly, the first prong of the *Lemon* test is satisfied. The second prong is also satisfied because the Board's issuance of permits to Y.O.U. for its summer program does not have the principal or primary effect of advancing religion. Rather, by its conduct, the Board may be viewed to have demonstrated hostility toward religion. Discussing this prong in *Gregoire,* the Third Circuit stated:

> We note first *Widmar's* conclusion that, in the university setting, granting a religious organization permission to use school facilities does not imply an endorsement of religious goals. In reaching this conclusion, the Court stressed the free access given to a broad spectrum of groups. This was seen as an "important index of secular effect." 454

---

**10.** Judge Mansmann, in *Gregoire,* discussed the educational setting which was one involving elementary and secondary school students who are immature, impressionable and likely to be impacted by the religious content of the speech involved. 907 F.2d at 1380. This issue is not raised here because the religious content of the Y.O.U. summer program is not directed at the student body. Rather, participation in the summer program is entirely voluntary.

U.S. at 274, 102 S.Ct. at 277. In *Widmar,* the second prong of the *Lemon* test was satisfied.

We believe that it is satisfied here as well. Where groups seeking access to the high school facilities are treated equally, the message communicated "is one of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion." *Mergens,* —— U.S. at ——, 110 S.Ct. at 2371.

907 F.2d at 1380.

Here, by giving access to the "large spectrum" of groups conducting a variety of activities, including Y.O.U. and its summer program, defendants have, in the past, demonstrated neutrality toward speech, including religious speech. The refusal to permit Y.O.U. to conduct its summer program because of its religious content can be viewed as giving rise to an inference of hostility to such content. Finally, as to the third prong of the *Lemon* test, excessive government entanglement, the Court of Appeals stated in *Gregoire:*

We also adopt the Supreme Court's analysis in *Widmar* in considering the third prong of the *Lemon* test—whether granting access to Student Venture will promote excessive entanglement with religion. "The usual setting for an establishment clause violation is when a state official, in order to avoid giving state aid to religion, must make determinations as to what activity or material is religious in nature, and what is secular and therefore permissible." *Bender [v. Williamsport Area School Dist.*], 741 F.2d [538] at 555 [3rd Cir.1984]. A content-neutral access policy eliminates the need for these distinctions. As *Widmar* points out, prohibiting religious meetings may actually exacerbate entanglement. The Court's comments concerning the university setting are instructive:

> [t]he University would risk greater "entanglement" by attempting to enforce its exclusion of "religious worship" and "religious speech." Initially, the University would need to deter-

mine which words and activities fall within "religious worship and religious teaching." This alone could prove an impossible task in an age where many and various beliefs meet the constitutional definition of religion. There would also be a continuing need to monitor group meetings to ensure compliance with the rule.

*Widmar,* 454 U.S. at 272 n. 11, 102 S.Ct. at 275 n. 11 (citations omitted). We find nothing in the facts of this case weighing against the application of *Widmar* on this issue and thus conclude that there is no risk of excessive entanglement with religion in Centennial's applying a content-neutral approach to facilities access in the evening hours. The third prong of the *Lemon* test, then, is satisfied.

907 F.2d at 1381.

In the present case, by requiring its principals and the executive director of business affairs to make determinations concerning the application of Board policy respecting an organization's religious or sectarian purposes, the Board may actually cause, rather than avoid, excessive government entanglement with religion. Such a potential entanglement would be eliminated by a content-neutral permit process not requiring such involvement by its officials.

28. Based on the evidence presented during the preliminary injunction hearing, the court concludes that Y.O.U. has established a reasonable probability that the Board's policy, as implemented by the individual defendants in the withdrawal of the permits issued to Y.O.U., cannot withstand the strict scrutiny test enunciated in *Perry.* Y.O.U. has, accordingly, established the first element required for preliminary injunctive relief.

29. The second element necessary for preliminary injunctive relief is whether Y.O.U. will be irreparably injured by the denial of such relief. This requires little discussion. In *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547, 565 (1976), the Supreme Court stated that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

Therefore, the second element for preliminary injunctive relief has been established.

30. Turning to the third element for preliminary injunctive relief, whether granting the preliminary relief will result in greater harm to the Board, it is clear that this element is also satisfied in the present case. For the past twenty years, Y.O.U. has conducted summer programs in the Pittsburgh public schools that have been essentially identical to this year's summer program as far as religious activities. Under the circumstances, it is difficult to imagine how greater harm will result to the Board if it is required to continue to honor the permits already issued to Y.O.U. to conduct its summer program in school facilities for the remainder of the program. As noted above, the Board may take any action it desires to make it clear to the participants in the summer program, and to the public at large, that, by issuing permits to Y.O.U. for the use of public school facilities, it is not endorsing any religious or sectarian point of view expressed during the conduct of the program.

31. The fourth and final element for preliminary injunctive relief is whether granting the relief will be in the public interest. It is undisputed that Y.O.U.'s summer program is worthwhile and beneficial to its participants. According to the testimony at the hearing, most of the participants in Y.O.U.'s summer program reside on the North Side of the City of Pittsburgh. This area has a substantial drug problem. Many of the parents whose children participate in Y.O.U.'s summer program cannot afford day care during the summer months. In many cases, if Y.O.U.'s summer program were unavailable to these children, they would be left unsupervised for extended periods of time. For a minimal registration fee of $2.00, the children participate in a program that not only provides necessary supervision, but also tutoring in such important subjects as remedial reading. In addition, the children are furnished with breakfast and lunch at no extra charge. Therefore, the court concludes that granting Y.O.U.'s motion for preliminary injunctive relief will also be in the public interest.

32. Plaintiff Y.O.U. has established the elements required to entitle it to a preliminary injunction directing defendants to restore the revoked school use permits, and enjoining defendants from revoking such permits before they expire according to their terms.