[APPENDIX NOT ATTACHED. PLEASE CONTACT CLERK'S OFFICE FOR COPY.]
UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT

No. 94-1116

AIDS ACTION COMMITTEE OF MASSACHUSETTS, INC.,

Plaintiff, Appellee,

v.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Circuit Judge,
Bownes, Senior Circuit Judge,
and Stahl, Circuit Judge.

James G. Reardon, with whom Margaret R. Suuberg, Julie E.
Reardon, Francis J. Duggan, and Reardon & Reardon, were on brief for
appellants.
H. Reed Witherby, with whom Smith, Duggan & Johnson, Sarah R.
Wunsch and Massachusetts Civil Liberties Union Foundation, were on
brief for appellee.

November 9, 1994


BOWNES, Senior Circuit Judge. In this appeal, we BOWNES, Senior Circuit Judge.

must decide whether defendant-appellant Massachusetts Bay

Transportation Authority (MBTA) acted constitutionally in

declining to run in its subway and trolley cars seven public

service advertisements composed by plaintiff-appellee AIDS

Action Committee of Massachusetts, Inc. (AAC). The ads

promote the use of condoms to help stop the spread of the

virus which causes AIDS, the Human Immunodeficiency Virus

("HIV"). The district court ruled that the MBTA's actions

contravened the First Amendment, and issued an injunction

which, inter alia, ordered the MBTA to run the AAC ads. See

AIDS Action Committee of Mass., Inc. v. Massachusetts Bay

Transp. Auth., 849 F. Supp. 79 (D. Mass. 1993). For reasons

different than those relied upon by the district court, we

agree that the MBTA's actions violated the First Amendment.

We therefore affirm.

I. I.

AAC is a Massachusetts not-for-profit corporation

which includes among its main purposes AIDS education of the

general public, individuals at high risk of HIV infection,

and health care professionals. The MBTA is a political

subdivision of the Commonwealth of Massachusetts. It is

explicitly authorized to "sell, lease or otherwise contract

for advertising in or on the facilities of the authority."

See Mass. Gen. L. ch. 161A, 2 and 3 (1993). Through its

-2- 2

advertising agent, Park Transit Displays, Inc. ("PTD"), which

was a defendant below but is not a party to this appeal, the

MBTA regularly authorizes the posting of commercial and

public service advertisements in the spaces above its car

windows and doors. The MBTA, in conjunction with PTD, has

accepted and continues to accept public service

advertisements on a wide variety of topics.

In July 1992, AAC submitted seven proposed public

service advertisements ("the 1992 AAC ads") to the MBTA and

requested that they be run in September 1992. Each of the

proposed ads had a large color picture of a condom wrapped in

a package, and a message stating that latex condoms are an

effective means of preventing the transmission of HIV. The

ads also included headlines and copy which, to varying

degrees, involved the use of sexual innuendo and double

entendre. In August 1992, the MBTA told AAC that it was

rejecting three of the seven ads. In September 1992, the

MBTA changed its mind, and informed AAC that it would run the

three previously-rejected ads in October 1992 at no cost to

AAC. The MBTA had run the other four ads in September 1992.

The seven 1992 AAC ads are reproduced as Exhibit A in the

Appendix.

The 1992 AAC ad campaign precipitated a significant

number of telephone calls and letters to the MBTA. The MBTA

submitted to the district court thirty-seven letters and

-3- 3

summaries of telephone calls as a sample of this reaction.

One of the MBTA's submissions reflects a rider's support of

the ad campaign; the other thirty-six exhibit strong

opposition. Of the thirty-six letters and telephone calls

complaining about the ads, twelve (one-third) contain

explicit homophobic statements. There is nothing in any of

the 1992 AAC ads, however, that even indirectly refers to

gays, lesbians, or gay/lesbian issues.

In February 1993, the MBTA promulgated a document

entitled "Commercial and Public Service Advertising Policy"

("the Policy"). The Policy contains a mission statement,

outlines the approach that the MBTA will take in deciding

whether to accept proposed ads, and sets forth a list of

guidelines for commercial and public service advertising.

Among other things, the guidelines state:

All advertising placed by PTD must meet
the same guidelines governing broadcast
and private sector advertising with
respect to good taste, decency and
community standards as determined by the
Authority. That is to say, the average
person applying contemporary community
standards must find that the
advertisement, as a whole, does not
appeal to a prurient interest. The
advertisement must not describe, in a
patently offensive way, sexual conduct
specifically defined by the applicable
state law, as written or authoritatively
construed. Advertising containing
messages or graphic representations
pertaining to sexual conduct will not be
accepted.

-4- 4

The public service advertising guidelines also note that

"[t]he purpose of the project being advertised should be such

that the advertising methodology can help achieve the

objectives and goals of benefitting and educating society,"

and that "[t]he project should be of sufficient seriousness

and public importance to warrant the use of public service

advertising space."

In March 1993, AAC submitted another proposed

public service ad to the MBTA. The ad included a picture of

a condom, and contained a headline stating: "Read this

before you get off." Copy beneath the headline read: "Just

a reminder to always use a latex condom. Barring abstinence,

it's the best way to prevent AIDS. For more information,

call the AIDS Action Committee Hotline at 1-800-235-2331."

The MBTA rejected this ad. Subsequently, in September 1993,

AAC submitted six additional proposed ads to PTD, requesting

that they be displayed in October and November 1993. The six

ads, each of which contained a picture of a condom, read as

follows:

1. Headline: "Haven't you got enough to
worry about in bed?" Copy: "Use a
latex condom. It might not take your
mind off everything during sex, but
at least you'll have one less thing
to worry about. AIDS. For more
information about HIV and AIDS,
call the AIDS Action Committee
Hotline at 1-800-235-2331."

2. Headline: "Even if you don't have
one, carry one." Copy: "A latex

-5- 5

condom is the best way to prevent
AIDS. So make sure that you've got
one on you when it's time to put one
on him. For more information about
HIV and AIDS, call the AIDS Action
Committee Hotline at 1-800-235-2331."

3. Headline: "Simply having one on hand
won't do any good." Copy: "For a
latex condom to be effective against
AIDS, you've got to put it on the
correct appendage. Use a condom.
Barring abstinence, it's the best way
to prevent AIDS. For more
information about HIV and AIDS, call
the AIDS Action Committee
Hotline at 1-800-235- 2331."

4. Headline: "You've got to be putting
me on." Copy: "You mean you're not
using a latex condom every time? You
can't be serious. Barring
abstinence, it's the best way to
prevent AIDS. For more
information about HIV and AIDS,
call the AIDS Action Committee
Hotline at 1-800-235-2331."

5. Headline: "Tell him you don't know
how it will ever fit." Copy:
"Nothing will give him a swelled head
faster than flattery. So compliment
him on his good sense in using a
latex condom. Barring abstinence,
it's the best way to prevent AIDS.
For more information about HIV and
AIDS, call the AIDS Action
Committee Hotline at 1-800-235-
2331."

6. Headline: "One of these will make
you 1/1000th of an inch larger."
Copy: "Of course, everyone says
size doesn't matter. But a thin
layer of latex could make all the
difference in the world. Use a
condom. Barring abstinence,
it's the best way to prevent
AIDS. For more information about
HIV and AIDS, call the AIDS

-6- 6

Action Committee Hotline at 1-800-235-
2331."

These six ads, together with the ad proposed and rejected in

March 1993 (collectively "the 1993 AAC ads"), are the only

ones at issue in this litigation. All seven are reproduced

as Exhibit B in the Appendix.

The MBTA and PTD reached four different and

contradictory conclusions regarding the acceptability of the

six ads presented in September 1993. On or about September

30, 1993, PTD accepted ads 1-4, but rejected ads 5 and 6.

Two days later, however, PTD told AAC that it could run ad 1

only if it deleted the phrase "in bed," and that it could run

ad 3 only if it deleted the phrase "the correct appendage."

Later, in the first week of October 1993, the MBTA itself

weighed in, informing AAC that it could run ad 2 only if it

omitted the word "him," and that it could run ad 4 only if it

rewrote the headline to read "You've got to be kidding." At

this same time, the MBTA and PTD informed AAC that ads 5 and

6, which had been previously rejected in toto, could run with

substantial editorial changes. In the end, the MBTA

completely rejected all except ads 3 and 4, and indicated

that it would run ad 3 only if AAC edited it. AAC declined

to engage in any editing, and none of the ads were run.

Although the MBTA contends on appeal that its

decisions regarding the six ads submitted in September 1993

were guided by its written advertising Policy (a claim

-7- 7

vigorously disputed by AAC), it made no reference to the

Policy in its discussions with AAC. In fact, in the course

of this litigation, the MBTA did not specifically identify

the portions of the Policy on which it was relying until it

filed its Reply Brief, wherein it states: "As AAC well

knows, the advertisements were rejected because they violate

the MBTA's Policy. Specifically, the advertisements describe

sexual conduct in a patently offensive way and contain

graphic representations pertaining to sexual conduct." This

assertion is called into question, however, by the affidavit

of the MBTA's General Manager for Marketing and

Communication, Loring Barnes. In explaining why the ads were

rejected, Barnes makes no mention of the Policy; instead,

while characterizing the ads as "lewd, vulgar, indecent and

us[ing] sexually explicit metaphors" (standards which are

similar to those set forth in the Policy), Barnes states that

"the fact that the ads are unsuitable for viewing by children

was the primary factor in the MBTA's [decision] . . . ."

Moreover, Barnes avers that the passengers on MBTA cars

constitute a captive audience, and implies that this fact

requires the MBTA to take passenger sensibilities into

account in deciding whether to run a submitted ad. The

Policy does not explicitly note that suitability for viewing

by children or a captive audience will guide the MBTA's

decisions on whether to accept proposed ads. In October 1993,

-8- 8

at roughly the same time it was rejecting the ads submitted

by AAC in September 1993, the MBTA accepted and ran two ads

for the movie "Fatal Instinct." Both of these ads

prominently feature the bare, crossed legs of a seated woman

whose cleavage is visible but whose face is largely obscured.

In one of the ads, the woman is suggestively eating a hot

dog, and the headline "Come here often?" is displayed at

crotch level. In the second ad, the headline "Opening Soon"

is displayed at crotch level across the woman's bare, crossed

legs. The Barnes affidavit states that "the ad [sic] for the

movie "Fatal Instinct" was vulgar and inappropriate. That ad

[sic] never would have been run if it had been brought to the

MBTA's attention in advance." The "Fatal Instinct" ads are

reproduced as Exhibit C in the Appendix.

Eventually, AAC brought suit against the MBTA and

PTD under 42 U.S.C. 1983 and similar state law provisions,

seeking declaratory and injunctive relief. The complaint

alleged, inter alia, violations of the First Amendment's Free

Speech Clause and the Fourteenth Amendment's Equal Protection

Clause, and included a facial and as-applied challenge to the

constitutionality of the MBTA's Policy. AAC initially

requested a preliminary injunction, but at the hearing

thereon all parties stipulated that the district court could

decide the matter on the merits based upon the existing

documentary record.

-9- 9

As one might expect, the record at that early stage

in the proceedings was sparse. In addition to copies of all

the ads discussed above and a copy of the MBTA's advertising

Policy, AAC submitted a verified complaint, which states that

AAC's use of sexual innuendo and double entendre in the

proposed ads was not gratuitous, but instead was directed at

"achiev[ing] a crucial goal of convincing sexually active

individuals, particularly adolescents and young adults, to

use condoms to prevent the spread of HIV." As the complaint

explains:

The ads are based upon recognition of the
principle that appeals to fear are less
effective in motivating behavior change
and that humor is more likely to achieve
the intended effect on the target
audience. The ads were specifically
aimed at, and designed to overcome,
barriers to condom use that have been
identified by experts, including
adolescents' sense of immortality and the
male ego. Using humor, the ads are
designed to take some of the edge off of
the otherwise sober message in order to
make the intended audience more receptive
to it. In the judgment and experience of
AIDS Action Committee's staff and of the
advertising professionals who designed
the ads, this approach is the most
effective way to reach and persuade this
audience.

AAC also presented a sworn declaration from David H.

Mulligan, Commissioner of the Department of Public Health for

the Commonwealth of Massachusetts, attesting to the severity

of the AIDS crisis among Massachusetts adolescents and

expressing his view that the ads at issue "are likely to

-10- 10

reach their target audience and therefore will perform a

public service." Finally, AAC introduced letters of support

from Massachusetts Governor William Weld and Dr. James W.

Curran, Assistant U.S. Surgeon General.

The MBTA's submissions also were meager. In

addition to the affidavit of Loring Barnes, copies of the

1992 AAC ads, and the letters and summaries of telephone

calls we have discussed above, the MBTA introduced examples

of less sexually suggestive ads, previously run by the MBTA

and other transportation authorities, which advocate the use

of condoms to prevent the spread of AIDS. The MBTA also

presented a copy of a breast cancer ad to which AAC had

referred in its complaint without attaching it as an exhibit.

Finally, the MBTA presented an ad inquiry featuring a

photograph of an aborted fetus. The MBTA submitted this to

underscore its need to "place limits on the ads placed in its

trains."

On December 29, 1993, after reviewing the

documentary evidence, the district court issued its

Memorandum of Decision. See 849 F. Supp. at 79. The court

first found that the MBTA, by posting ads on a wide variety

of topics over the years, by hiring PTD to promote MBTA

facilities as advertising venues, and by publishing its

advertising Policy, had designated the interiors of its cars

as public fora. Id. at 83; see also Perry Educ. Ass'n. v.

-11- 11

Perry Local Educators' Ass'n., 460 U.S. 37, 45-47 (1983)

(establishing three categories of public property for free

speech purposes: traditional public fora, designated public

fora, and nonpublic fora).

Relying on this conclusion, and on the fact that

First Amendment standards apply in a designated public forum

to the same extent as in a traditional public forum (i.e., a

forum [such as a street or park] "which by long tradition or

government fiat ha[s] been devoted to assembly and debate,"

Perry, 460 U.S. at 45), see, e.g., Board of Airport Comm'rs

v. Jews for Jesus, Inc., 482 U.S. 569, 573 (1987), the court

next considered whether the ads could be constitutionally

excluded. 849 F. Supp. at 83-84. In so doing, it

scrutinized whether the standard by which the ads were

rejected was either (1) a content-neutral time, place, or

manner restriction, narrowly tailored to serve a significant

state interest and leaving open ample, alternative channels

of communication; or (2) a content-based restriction,

necessary to serve a compelling state interest and narrowly

drawn to achieve that end. Id.; see also Perry, 460 U.S. at

45-46 (reciting the permissible speech restrictions in

traditional and designated public fora). After noting the

ambiguity as to whether the MBTA excluded the ads pursuant to

its written advertising Policy or under some unwritten policy

alluded to in the Barnes affidavit, 849 F. Supp. at 83 n.6,

-12- 12

the district court determined that the exclusions were

content-based, and that whatever standard guided them had to

be both necessary to serve a compelling state interest and

narrowly drawn to achieve that end, id. at 84. 

Finally, the court decided that the state interests

allegedly dictating the challenged exclusions -- the

protection of both children and the sensibilities of a

captive audience -- were not, in the context of this case,

compelling. Id. Accordingly, it permanently enjoined the

MBTA from refusing to accept and display in its cars and on

its train platforms the six advertisements originally

submitted in September 1993. Id. at 85. In what appears to

have been an oversight, the judgment failed to mention the ad

submitted in March 1993. See id. The court also permanently

enjoined the MBTA from using its advertising Policy "as a

basis for rejecting non-obscene and non-defamatory public

service advertisements on the basis of their content." Id.

This appeal followed.

II. II.

When faced with a party's appeal from an adverse

ruling after a bench trial on the merits, our role as an

appellate tribunal ordinarily is quite circumscribed. While

we review de novo the district court's legal determinations,

we accord a significant amount of deference to the court's

factual determinations and to most of its resolutions of

-13- 13

mixed fact/law issues, letting them stand unless they are

clearly erroneous. See, e.g., Williams v. Poulos, 11 F.3d

271, 278 and n.11 (1st Cir. 1993).

In cases like this one, however, where the trial

court is called upon to resolve a number of mixed fact/law

matters which implicate core First Amendment concerns, our

review, at least on these matters, is plenary so that we may

reduce the likelihood of "`a forbidden intrusion on the field

of free expression.'" See Bose Corp. v. Consumer Union of

United States, Inc., 466 U.S. 485, 499 (1984) (quoting New

York Times Co. v. Sullivan, 376 U.S. 254, 286 (1964)). The

Bose rule recognizes that the meaning of a particular legal

standard -- e.g., the meaning of "actual malice" in a product

disparagement action -- often "cannot be adequately expressed

in a simple statement," and must be developed through case-

by-case adjudication. Id. at 503. It also recognizes a

heightened need for vigilance and consistency when that

standard is supplied by the Constitution, particularly by the

First Amendment. See id. at 503-04. De novo review of the

trial court's application of a First Amendment standard to

the facts before it "ensures that the federal courts remain

zealous protectors of First Amendment rights." Duffy v.

Sarault, 892 F.2d 139, 142-46 (1st Cir. 1989).

These principles provide a self-evident corollary

to the oft-cited maxim that we, as an appellate court, are

-14- 14

"free to affirm the judgment below on any independently

sufficient ground made manifest by the record." See, e.g.,

Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st

Cir. 1994). The corollary is that, so long as the record is

adequately developed, we will not hesitate to resolve a mixed

fact/law issue involving a core First Amendment concern even

though the district court did not address it in the first

instance. This rule furthers the interest of judicial

economy by avoiding the remand of a question over which we

eventually will exercise full review; it also serves the

interest of expediency on questions -- e.g., the legality of

a prior restraint of speech -- where a timely ruling is often

crucial.

III. III.

On appeal, the MBTA makes several arguments, which

we rearrange for ease of analysis. First, the MBTA argues

that the district court erred in finding that the denial of

the proposed ads was not effectuated pursuant to a narrowly-

tailored, content-neutral manner regulation. Next, the MBTA

contends that the district court erred in finding that the

interiors of its cars are designated public fora, and that

this erroneous conclusion led the court to apply too strict a

level of scrutiny to the exclusion of the ads. Finally, the

MBTA asserts that even if the court did not err in its

designated public fora finding, it erred in concluding that

-15- 15

the exclusion did not pass constitutional muster under

heightened scrutiny.

As we shall explain, we think that the district

court correctly determined that the MBTA's rejection of the

ads was content-based. Accordingly, we reject the MBTA's

first appellate argument. We do not reach the MBTA's second

and third appellate arguments, however, because we find that,

in rejecting the 1993 AAC ads while running the "Fatal

Instinct" ads, the MBTA engaged in content discrimination

which gave rise to an appearance of viewpoint discrimination,

and that it has failed to explain that appearance away. Cf.

Bose, 466 U.S. at 505 ("The principle of viewpoint neutrality

that underlies the First Amendment itself . . . imposes a

special responsibility on [appellate] judges whenever it is

claimed that a particular communication is unprotected.")

(citation omitted).

A. Content-Based vs. Content-Neutral Restrictions A. Content-Based vs. Content-Neutral Restrictions

As we have noted, the MBTA renews its argument,

first made to the district court, that the Policy by which

the 1993 ads were excluded is a content-neutral restriction

on the manner in which messages may be conveyed on its cars.

In the MBTA's view, its disallowance of "sexually explicit or

patently offensive language to convey . . . substantive

message[s]" is more akin to a paradigmatic manner regulation

(e.g., a prohibition of megaphones) than it is to a typical

-16- 16

regulation which suppresses speech on the basis of its

content (e.g., a prohibition of public service ads which

discuss abortion). Even if we accept arguendo that the 1993

AAC ads are "sexually explicit" or "patently offensive" and

that the ads actually were excluded pursuant to the Policy,

we find the MBTA's argument to be seriously flawed.

Although it might be reasonable, in an analytical

vacuum, to characterize a prohibition on the use of sexually

explicit or patently offensive language to communicate an

idea as a limitation on the "manner" in which a speaker may

speak, such a characterization flies in the face of how the

Supreme Court has construed the concept of manner through

case-by-case adjudication. Cf. Bose, 466 U.S. at 503. The

Court has defined the term narrowly, making clear that, in

order to be considered a valid manner restriction, a

regulation cannot be aimed at the communicative impact of

expressive conduct. See Laurence A. Tribe, American

Constitutional Law, 12-2, at 791-92 (2d ed. 1988). This is

made manifest by the overarching requirement that a time,

place, or manner restriction be content-neutral. See Perry,

460 U.S. at 45. Thus, the Supreme Court rejected the

argument that the statute under which Paul Robert Cohen was

convicted for wearing a jacket bearing the words "Fuck the

Draft," as applied to Cohen in that case, was a valid

regulation of the manner in which he exercised his

-17- 17

constitutional right to speak freely. See Cohen v.

California, 403 U.S. 15, 19-26 (1971). Central to the Cohen

Court's reasoning was a disagreement with "the facile

assumption that one can forbid particular words without also

running a substantial risk of suppressing ideas in the

process." Id. at 26; cf. Hustler Magazine, Inc. v. Falwell,

485 U.S. 46, 51 (1988) (recognizing the need to keep

"individual expressions of ideas . . . free from

governmentally imposed sanctions") (emphasis supplied).

Clearly then, a regulation which permits an idea to be

expressed but disallows the use of certain words in

expressing that idea is content-based.

The two cases cited by the MBTA in arguing that its

Policy is content-neutral actually support a contrary

conclusion. In Bethel School Dist. No. 403 v. Fraser, 478

U.S. 675 (1986), a case which upheld the right of school

authorities to discipline a student for "indecently lewd and

offensive speech" at a school assembly, see id. at 685, the

Court in no way indicated that the school disciplinary rule

forbidding "obscene, profane language" was content-neutral.

Rather, a fair reading of the opinion in context makes

apparent that the Court viewed the rule as content-based.

See generally id. at 681-86. Indeed, the Court is quite

clear that the school's need to counter the content of the

student's speech, and not the need to regulate the incidental

-18- 18

and noncommunicative impact of the speech, justified the

disciplinary action taken. Id. at 685 ("[I]t was perfectly

appropriate for the school to disassociate itself to make the

point to the pupils that vulgar speech and lewd conduct is

wholly inconsistent with the `fundamental values' of public

school education.").

In FCC v. Pacifica Foundation, 438 U.S. 726 (1978),

a case in which the Court upheld the right of the Federal

Communications Commission to regulate the radio broadcast of

"indecent" language in a monologue by the comedian George

Carlin, the Court was even more explicit. It noted:

The words of the Carlin monologue
are unquestionably "speech" within the
meaning of the First Amendment. It is
equally clear that the Commission's
objections to the broadcast were based in
part on its content. The [Commission's]
order must therefore fall if, as Pacifica
argues, the First Amendment prohibits all
governmental regulation that depends on
the content of speech.

Id. at 744. As it did in Bethel, the Court went on to hold

that the content-based regulations at issue were justified

under the facts and circumstances of that particular case.

Id. at 748-51.

Here, there can be no doubt that the MBTA's Policy,

on its face and as applied to AAC's proposed ads, is not

content-neutral. The Policy does not allow communication of

the underlying message by means of any words which enjoy

First Amendment protection; instead, it limits the universe

-19- 19

of words the speaker may select to those which are not, in

PTD's and/or the MBTA's view, "sexually explicit" or

"patently offensive." Hence, the district court correctly

declined the MBTA's invitation to treat it as a time, place,

or manner restriction. See Perry, 460 U.S. at 45.

B. Viewpoint Discrimination B. Viewpoint Discrimination

In its complaint, AAC raised the issue of viewpoint

discrimination by noting that the MBTA was excluding its ads

at the same time it was running, inter alia, the ads for the

movie "Fatal Instinct." The district court never reached

this issue, finding instead that the MBTA, having designated

the interiors of its cars as public fora, lacked a compelling

basis for excluding the 1993 AAC ads, and further finding

that the MBTA's Policy was unconstitutional on its face.

It is exceedingly difficult to say whether the MBTA

has designated the interiors of its cars as public fora on

the record before us. As we have already noted, the record

is not particularly well developed. On the one hand, AAC has

provided us with precious little evidence of the MBTA's

practice in accepting or rejecting ads over the past few

years. On the other hand, despite the MBTA's attempts to

present itself as a vigilant gatekeeper, the only ads other

than the 1993 AAC ads that we know the MBTA recently rejected

are certain Calvin Klein ads which somehow might have been

misconstrued as endorsing the Ku Klux Klan, and an animal

-20- 20

rights ad featuring a photograph of a maimed dog. We

appreciate that the parties are anxious to have us settle the

public forum question. Because we do not even know whether

and when the written advertising Policy went into effect,

however, and because we find in the record an independently

sufficient ground for affirming the district court, we

decline to anchor an important First Amendment ruling on so

fragile a foundation.

Our decision not to reach the public forum question

is informed by an additional consideration: the relatively

murky status of the public forum doctrine. On the one hand,

the Supreme Court, in a pre-Perry case, indicated that public

mass transit organizations, acting in proprietary capacities,

may allow a significant amount of public discourse while

still constitutionally excluding broad categories of speech

based on content. See Lehman v. City of Shaker Heights, 418

U.S. 298 (1974) (upholding city's right to exclude political

advertising from its rapid transit system). And, in several

recent cases, the Court has used language suggesting that, in

determining whether the government qua proprietor has

designated public property to be a public forum, courts

should be highly deferential to the government's decisions to

regulate speech. See International Soc'y for Krishna

Consciousness, Inc. v. Lee, 112 S. Ct. 2701, 2705 (1992)

(holding the vestibules of the three major airports in the

-21- 21

New York City area not public fora); United States v.

Kokinda, 497 U.S. 720, 725 (1990) (holding sidewalk outside

post office not a public forum). Indeed, these cases suggest

that courts should hinge their analyses largely on whether

the government intended that the property become a designated

public forum. See Lee, 112 S. Ct. at 2706; Kokinda, 497 U.S.

at 725; Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,

473 U.S. 788, 802 (1984) (holding the Combined Federal

Campaign for charitable fundraising not a public forum).

Broadly read, Lee, Kokinda, and Cornelius suggest that the

very existence of the MBTA's written Policy may be a

sufficient basis for finding that the interiors of MBTA cars

are not public fora.

On the other hand, the Court also has stated that

the government's intent must be gleaned from its policy and

practice with respect to the property at issue. See

Cornelius, 473 U.S. at 802; see also Grace Bible Fellowship,

Inc. v. Maine School Admin. Dist. No. 5, 941 F.2d 45, 47 (1st

Cir. 1991) (in determining whether the government has

designated some property to be a public forum, "actual

practice speaks louder than words"). It also has indicated

that it will not infer an intent not to designate a public

forum solely from the fact that the government excluded

certain speech or speakers in the case before it. See Lamb's

Chapel v. Center Moriches Union Free School Dist., 113 S. Ct.

-22- 22

2141, 2146 (1993) (evidencing a willingness to find that a

public school district had designated certain property as a

public forum, even in the face of contrary protestations,

where the property "is heavily used by a wide variety of

private organizations"). These cases indicate that evidence

not currently in this record may well drive the determination

whether the interiors of MBTA cars are public fora.

At any rate, we turn now to the question of

viewpoint discrimination -- or more specifically, the

unrebutted appearance of viewpoint discrimination -- which we

think disposes of this appeal. Throughout the course of

these proceedings, the MBTA has asserted that it has been

viewpoint neutral because it has in no way opposed the

message that wearing a latex condom is an effective means of

preventing the transmission of HIV. If this assertion

accurately characterized the level of specificity at which

AAC is making its viewpoint discrimination claim, we would

have to agree. It is abundantly clear that the MBTA has not

opposed expression of the view that the use of condoms is

effective in the fight against AIDS.

AAC's two-part viewpoint discrimination argument,

which we cull from its complaint, is, however, more specific.

First, AAC points out that the MBTA has engaged in content

discrimination by applying its Policy to disallow AAC's use

of sexual innuendo and double entendre to communicate its

-23- 23

messages while simultaneously permitting other advertisers to

communicate their messages through these modes of expression

and at levels of explicitness equalling, if not exceeding,

that in the AAC ads. Second, AAC contends that this content

discrimination is prohibited even in a nonpublic forum (where

the underlying speech might be otherwise proscribable)

because it gives rise to an appearance of viewpoint

discrimination which the MBTA has failed to explain away.

We find this argument persuasive.

Even if we again assume arguendo that the MBTA has

correctly characterized the AAC ads as sexually explicit

and/or patently offensive, that it has excluded them pursuant

to its written Policy, and that it may constitutionally

proscribe sexually explicit and/or patently offensive speech

in its cars, we must decide whether the content

discrimination inherent in the MBTA's decision to run the

"Fatal Instinct" ads, while not running the AAC ads, is

permissible. After all, we think the presence of content

discrimination in the MBTA's application of its Policy cannot

seriously be disputed. The "Fatal Instinct" ads are at least

as sexually explicit and/or patently offensive as the AAC

ads. Their headlines are as suggestive as the most daring of

the AAC ads; they contain provocative photographs not found

in the AAC ads; and they involve a less protected type of

speech -- commercial speech -- than that in the AAC ads. See

-24- 24

Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer

Council, Inc., 425 U.S. 748, 772 n.24 (1976) (noting that

commercial speech has "a different degree of protection").

The most recent and authoritative statement on the

permissibility vel non of content discrimination within the

context of proscribable speech is found in Justice Scalia's

majority opinion in R.A.V. v. City of St. Paul, Minnesota,

112 S. Ct. 2538 (1992). We quote from R.A.V. at some length,

because we believe it highly relevant to this case:

Even the prohibition against content
discrimination that we assert the First
Amendment requires is not absolute. It
applies differently in the context of
proscribable speech than in the area of
fully protected speech. The rationale of
the general prohibition, after all, is
that content discrimination raises the
specter that the Government may
effectively drive certain ideas or
viewpoints from the marketplace. But
content discrimination among various
instances of a class of proscribable
speech does not pose this threat.
When the basis for the content
discrimination consists entirely of the
very reason the entire class of speech at
issue is proscribable, no significant
danger of idea or viewpoint
discrimination exists. Such a reason,
having been adjudged neutral enough to
support exclusion of the entire class of
speech from First Amendment protection,
is also neutral enough to form the basis
of distinction within the class. To
illustrate: A State might choose to
prohibit only that obscenity which is the
most patently offensive in its prurience
-- i.e., that which involves the most
lascivious displays of sexual activity.
But it may not prohibit, for example,
only that obscenity which includes

-25- 25

offensive political messages. And the
Federal Government can criminalize only
those threats of violence that are
directed against the President, since the
reasons why threats of violence are
outside the First Amendment (protecting
individuals from the fear of violence,
from the disruption that fear engenders,
and from the possibility that the
threatened violence will occur) have
special force when applied to the person
of the President. But the Federal
Government may not criminalize only those
threats against the President that
mention his policy on aid to inner
cities. And to take a final example, a
State may choose to regulate price
advertising in one industry but not in
others, because the risk of fraud (one of
the characteristics of commercial speech
that justifies depriving it of full First
Amendment protection), is in its view
greater there. But a State may not
prohibit only that commercial advertising
that depicts men in a demeaning fashion.

Id. at 2545-46 (citations and internal quotation marks

omitted) (third emphasis supplied). Largely on the basis of

these principles, the majority went on to strike down as

facially unconstitutional a city ordinance which criminalized

the expression of only those "fighting words" (a proscribable

type of speech, see Chaplinsky v. New Hampshire, 315 U.S.

568, 572 (1942)) based on "race, color, creed, religion or

gender." Id. at 2547. It did so because the content

discrimination countenanced by the statute was the sort that

gave off the appearance of hostility to certain viewpoints,

see R.A.V., 112 S. Ct. at 2547-48, and because the City of

St. Paul's comments and concessions in the case not only

-26- 26

failed to dispel this appearance but confirmed it as reality,

id. at 2549.

The MBTA's decision not to run the AAC ads while

running the "Fatal Instinct" ads, like the City of St. Paul's

decision to criminalize certain types of fighting words while

leaving others legal, constitutes content discrimination

which gives rise to an appearance of viewpoint

discrimination. And, the MBTA has not dispelled this

appearance. The MBTA has not attempted to articulate a

neutral justification for what happened; instead, it has

stated that running the "Fatal Instinct" ads was a mistake.

But this statement is unpersuasive, and by no means counters

the impression of discrimination.

The record basis for the claim of mistake is a

single sentence in a multi-page affidavit submitted by the

MBTA asserting, as we have stated, that "[t]hat ad [sic]

would never have been run if it had been brought to the

MBTA's attention in advance." There is no suggestion,

however, that the MBTA remained unaware of the "Fatal

Instinct" ads or made any effort to remove them. Nor is

there any explanation as to why, under whatever screening

process exists, the MBTA is able to detect threats from

written double entendres but unable to detect highly

provocative pictures (which themselves bear legends

containing obvious double entendres!).

-27- 27

One might easily infer that ads tend to be screened

not because they threaten to violate the Policy but because

they appear likely to generate controversy or, even more

surely, where controversy actually results. The 1992 AAC ads

were accepted, quite consciously after an initial dispute,

and the subsequent ones were rejected only after a number of

public letters of protest. The "Fatal Instinct" ads are more

overtly sexual and more blatantly exploitative; but they

represent the conventional exploitation of women's bodies for

commercial advertising. The condom ads, by contrast,

represent sexual humor addressed to men's bodies and --

because of the connection to AIDS -- are also capable of

provoking homophobic reactions from the public, and did.

These circumstances also lend themselves at least

to an appearance of viewpoint discrimination. Regardless of

actual motivation, grave damage is done if the government, in

regulating access to public property, even appears to be

discriminating in an unconstitutional fashion. And this

appearance is only aggravated when the sources may seem to

lie in demeaning stereotypes and phobias. In all events, the

MBTA has not effectively removed the taint of apparent

discrimination.

The MBTA seeks to explain its original acceptance

of the condom ads, and their later rejection, as a response

to the adoption of its Policy in the meantime. But the

-28- 28

Policy explains almost nothing: its language has at best

doubtful application to the condom ads but the most vivid

application to the "Fatal Instinct" ads, which are manifestly

designed to appeal to a prurient interest and certainly

contain "graphic representations pertaining to sexual conduct

. . . ."

The Policy itself is almost impossible to

understand. The purported exclusion of all messages or

representations "pertaining to sexual conduct" is so vague

and broad that it could cover much of the clothing and movie

advertising commonly seen on billboards and in magazines.

The prior sentence, relating to patently offensive

descriptions, is mysteriously connected to unspecified state

laws. The prurient interest reference appears to be derived

from one portion of the Supreme Court's obscenity definition,

but one never intended as a stand-alone criterion of

obscenity. And, significantly, the MBTA does not claim that

the condom ads themselves are constitutionally obscene.

We think that the opportunities for discrimination

created by this Policy have been borne out in practice, and

that this case presents an unrebutted claim of discrimination

in the application of supposedly neutral standards. It makes

no difference whether AAC prefers a broader ruling or

whether, as the MBTA claims, AAC failed technically to

preserve an equal protection objection. First Amendment

-29- 29

litigation of this kind has consequences that go far beyond

the individual parties. We think that the more far-reaching

issue that both sides might prefer to address (i.e., the

public forum issue) is not yet suited for resolution, and

that, on this record, the MBTA's action can properly be set

aside on the narrow basis set forth.

IV. IV.

It remains to consider the remedial judgment

adopted by the district court. In substance, it declared

that the Policy violates the First and Fourteenth Amendments,

and that the MBTA's failure to accept the AAC ads violates

those constitutional provisions. The judgment also enjoined

the Policy's future use as a basis for rejecting non-obscene

and non-defamatory advertisements, and directed that the

specific condom ads in question be displayed. Our own

rationale prompts us to provide a somewhat different gloss on

the relief to be afforded.

We think that the Policy in its present form is

scarcely coherent, invites the very discrimination that

occurred in this case, and was properly enjoined. Similarly,

absent a rational and neutral policy, implemented in a non-

discriminatory fashion, we see no basis for excluding the

present condom ads, nor any that are strictly comparable. To

this extent, we affirm the declarations and injunctions

ordered by the district court. At this time and on this

-30- 30

record, however, we are not prepared to determine that the

MBTA is a designated public forum.

Accordingly, if the MBTA chooses to develop a

different set of rules or criteria, we are unwilling to

foreclose the possibility that they might be sustained on a

different and better developed record, even if those rules or

criteria condemn some or all the ads in question.

Conversely, AAC would, in that eventuality, be entitled to

argue that the ads are protected simpliciter and without

regard to any discrimination.

Before concluding, we make one final point. Lest

we give the impression that we are endorsing the remedying of

a perceived wrong (the running of the "Fatal Instinct" ads)

with a second wrong (the running of potentially proscribable

AAC ads), we note that the controversial ads that will be run

as a result of this litigation, like the "Fatal Instinct"

ads, are most certainly not obscene, and fall well within the

heartland of speech that we, as a secure society, should be

willing to tolerate in the marketplace of ideas. We would,

of course, look askance on a judicial decree which sought to

rectify an impermissible viewpoint-based exclusion of, for

example, an obscene ad by ordering the government to run the

ad. But such is not the case here.

In the end, the MBTA may well be entitled to

exclude from the interiors of its cars speech containing a

-31- 31

certain level of sexual innuendo and double entendre. We do

not reach that question at this time. To do so

constitutionally, however, it will, at the least, need to act

according to neutral standards, and it will need to apply

these standards in such a way that there is no appearance

that "the [government] is seeking to handicap the expression

of particular ideas." R.A.V., 112 S. Ct. at 2549. We

recognize that this requires the government to apply its

standards quite precisely. This is the burden the government

assumes, however, when it undertakes to proscribe speech on

the basis of its content.

The judgment of the district court is affirmed, affirmed

with the modifications to the injunction noted above. No

costs.

-32- 32